RECEIPT # _____
AMOUNT $ _____
SUMMONS ISSUED _____
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
DATE _____

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

FILED
IN CLERKS OFFICE

CIVIL ACTION DOCKET NO. 04 C 12316 WGY

KEVIN P. LOUGHMAN,
A Citizen of the Commonwealth of Massachusetts,
Plaintiff

MAGISTRATE JUDGE _____

vs.

MAURA MAHONEY,
A Citizen of the State of Florida
In Her Capacity as
Security Services Manager,
Lotus Development Corporation
and

MAURA FEELEY,
A Citizen of the Commonwealth of Massachusetts
In Her Capacity as
Assistant District Manager,
First Security Services Corporation
and

LOTUS DEVELOPMENT CORPORATION,
A SUBSIDIARY OF IBM CORPORATION,
Armonk & While Plains, New York
and

FIRST SECURITY SERVICES CORPORATION,
A SUBSIDIARY OF PINKERTON'S/U. S. A., Inc.,
Westlake Village, California

Defendants

---

COMPLAINT

---

By and For the Plaintiff, Pro-Se
Kevin P. Loughman

4 Marrigan St., Arlington, Massachusetts, 02474
Telephone: 781-641-2756

Page 1

## COMPLAINT

### INTRODUCTION

1)    This is a Civil Action by The Plaintiff for
the torts of defamation and **slander per se**, by
spoken word concerning him, communicated to a
third party, by Ms. Maura Mahoney, in her of-
ficial capacity as a Security Services Manager
for the Lotus Development Corporation.

2)    This is also a Civil Action for the torts
of defamation and **libel per se**, arising from the
written re-publication of Ms. Mahoney's spoken
slander, by Ms. Maura Feeley, in her official
capacity as Assistant District Manager for the
First Security Services Corporation.

3)    The Plaintiff seeks general damages for
personal humiliation, embarrassment, injury to
his professional reputation, mental anguish, and
anxiety. In addition, The Plaintiff seeks to be
compensated for measurable economic loss from

Page 2

his consequential, wrongful, and pretext-based
termination by FSSC on November 25, 1998, and for
reasonable costs and fees, related to the pro-
secution of this Complaint.

## THE PARTIES

4)    Kevin P. Loughman (hereinafter identified
as "the Plaintiff") resides at 4 Marrigan Street,
in the Town of Arlington, in the County of Mid-
dlesex, in the Commonwealth of Massachusetts. He
is a dual citizen of the United States and also
of the Republic of Ireland.

5)    Defendant #1, Maura Mahoney (hereinafter
identified as "Ms. Mahoney") resides, on informa-
tion provided, at 7410 Lake Breeze Drive, in the
City of Ft. Myers, in the County of Lee, in the
State of Florida.  Ms. Mahoney is believed to be
a citizen of the United States.  She has been
identified as the originating source of a false,
malicious, and slanderous statement, concerning
Plaintiff, conveyed by speech to a third party.

Page 3

6)   Defendant #2, Maura Feeley (hereinafter
identified as "Ms. Feeley") resides, on informa-
tion provided, at 1 New St., in the Village of
Turner's Falls, in the Town of Montague, in the
County of Franklin, in the Commonwealth of Massa-
chusetts; and is also believed to be a citizen of
the United States.  Ms. Feeley recklessly, and
without regard to its falsity, re-published the
false, malicious, and slanderous spoken comment
of Ms. Mahoney concerning the Plaintiff, in abuse
of the conditional privilege ordinarily accorded
to an employer;  and in doing so, further defamed
the good name and reputation of the Plaintiff.

7)   Defendant #3, the Lotus Development Corp.,
(hereinafter identified as "LDC") is believed to
be a wholly owned subsidiary of the International
Business Machines Corp., also known as "IBM".
IBM, is based in Armonk and White Plains, both in
the County of Westchester, in the State of New
York, and is also believed to be incorporated in
New York State.  Lotus Development, LDC, is based

Page 4

at 1 Rogers Street, in the City of Cambridge, in
the County of Middlesex, in the Commonwealth of
Massachusetts.  When Defendant #1, Ms. Mahoney
verbally defamed the good name and reputation of
the Plaintiff, she was in the employment of, and
also acting as an agent for, Defendant #3 LDC,
in Cambridge, Massachusetts.  Accordingly, LDC is
joined, as a defendant/joint tortfeasor, under
the legal doctrine of *respondeat superior*.

8)    Defendant #4, First Security Services
Corporation (hereinafter identified as "FSSC")
is believed to be a wholly owned subsidiary of
Pinkerton's/U. S. A., which firm is based in
Westlake Village, in the County of Los Angeles,
in the State of California; and is believed to be
incorporated in California.  FSSC is based at #1
Harborside Dr., in the City of Boston, in the
County of Suffolk, in the Commonwealth of Massa-
chusetts.  When the Defendant #2, Ms. Feeley
published the slanderous statement of Defendant

Page 5

#1, Ms. Mahoney, thereby committing **libel per se**
against the Plaintiff, she was in the employment
of, and acting as an agent for, Defendant #4,
FSSC.  FSSC is, accordingly, also joined as a
defendant and joint tortfeasor under the legal
doctrine of "**respondeat superior**".

### JURISDICTION

9)    This Court has jurisdiction over this
Civil Action, pursuant to 28 U. S. C. § 1332,
as the parties are of diverse citizenship; and
since general damages under litigation exceed
seventy-five thousand dollars, ($75,000.00).

### BACKGROUND FACTS

10)    From June of 1994 until November 25th, 1998
the Plaintiff was employed as a security guard,
by FSSC, and was assigned to the LDC Client Ac-
count, until July 2, 1998, when, he was summarily
transferred to other security service clients.

Page 6

11)    The Plaintiff's on-the-job performance was reported to be of a high caliber by multiple FSSC Account Managers at Lotus Development, and the Plaintiff received highly positive performance evaluations in 1995, 1996, 1997, and 1998.

12)    In August of 1997, the Plaintiff responded favorably to multiple requests from FSSC Account Managers and he agreed to accept promotion to a newly-created position. He then became **Weekend Morning Shift Supervisor** at the LDC Account and he also then began to supervise a personnel staff of six officers, providing security services to the four-building LDC Headquarters in Cambridge.

13)    In February of 1998, the then incumbent LDC Account Manager of FSSC, Steve Walsh, a seasoned, twenty-year veteran of FSSC, completed a review of Plaintiff's on-the-job performance, after his first six months in the position of **Weekend Morning Shift Supervisor.**

Page 7

Of 25 so-called "evaluation factors", Plaintiff received ratings of "satisfactory" on four items and "above expectation" on twenty-one items. Mr. Walsh's comments with respect to the Plaintiff's bearing as an evaluation factor was as follows: "Extent to which employee was courteous, polite, and pleasant in all people contacts"? Response: "Very professional. Represents all of us in a positive way. Good interpersonal skills". A copy of this performance evaluation by the FSSC-LDC Account Manager, Steve Walsh, will be introduced into evidence at the appropriate time.

14)   At the beginning of May, 1998, in response to multiple requests from John Ashley, the successor to Steve  Walsh as  LDC Account Manager, the Plaintiff agreed to double his hours from sixteen per week to thirty-two, and agreed to work two weekday shifts, from 15:00 to 23:00 hours, in addition to his weekend shifts.

Page 8

15)    Sometime in the spring of 1998, an officer
whose name is Barbara Nicholas, was assigned to
the LDC Account, and in accordance with FSSC's
scheduling  policies, Ms. Nicholas was required
to work a Sundays shift, from 07:00 to 15:00
hours, thus bringing her under the supervision of
the Plaintiff for that particular shift.

16)  Ms. Nicholas, on information and belief,
is the step-daughter of a Mr. Alonnzo Herring,
who, in 1998, was the FSSC District Personnel
Officer for the District which included the LDC
Account.

17)  During her tenure at the LDC Account, Ms.
Nicholas, on information and belief, received
numerous verbal and/or written notices for sub-
standard task performance; for violation of FSSC
and LDC policies and procedures; and for observed
incidents of discourtesy or unpleasantness in her
inter-personal contacts, including those with her

Page 9

security officer peers and with some of her week-
day shift supervisors, excluding the Plaintiff.

18)   On May 24th, 1998, the Plaintiff, in his
capacity as **Weekend Morning Shift Supervisor,**
and taking account of several computer generated
print-outs of the comparative performance of all
security officers [related to both elapsed time
and to the imputed thoroughness of LDC building
tours], issued remedial orders to Ms. Nicholas as
well as to other security officers; designed to
reduce excessive speed of some building tours,
and to increase the thoroughness of building
tours, by causing guards to visit all prescribed
security check points within the four-building
LDC complex in Cambridge.  On information from
LDC computer-generated security records and on
recollection, Ms. Nicholas' security inspections
were completed in close to half of the average
time of all other security guards, and with the
number of required, but omitted check points,
about four times greater than the average.

Page 10

19)    Around 13:00 hours on May 24, 1998, the
Plaintiff learned that Ms. Nicholas had declined
to follow his earlier, remedial orders  for the
proper conduct of her morning building tour.
These legitimate orders were routinely given, in
clear and very precise English.  They were also
conveyed in a firm, polite, and business-like
manner.   These valid orders were conveyed as
orders, and not as optional requests.

20)    Following FFSC guidelines for security
officer discipline, the Plaintiff "wrote up"
a prescribed report of Ms. Nicholas's in-
subordination, and ordered that she should
read the document, and sign the document to
acknowledge having read it. Ms. Nicholas was
also counseled to offer her specific comments,
perspectives, observations, explanations, and
points-of-view about the original orders of
the morning, and also concerning the write-up
or incident report to FSSC Management, prepared

Page 11

by the Plaintiff, according to FSSC standard
operating procedures for officer discipline.

21)    Ms. Nicholas refused to read the document.
She refused, consequently, to sign it.  Instead,
she launched into a verbal tirade, regarding what
she called "tone-of-voice" and subsequently sent
an e-mail message, reflecting her dissatisfaction
with the events of the day, and with Plaintiff's
competence as a security guard and supervisor.

22)    These incidents, both the insubordination
of the morning, and the on-going insubordination
and the personalized abuse of the afternoon, were
promptly reported in writing to the FSSC-LDC
Account Manager at that time, whose name was John
Ashley.  Mr. Ashley is now deceased.

23)    The Plaintiff's emotional frame of mind on
May 24, 1998 may be described as subdued and also
**"sorrowful or grieving."**  The Plaintiff's father

had passed away during the previous week, and had been buried less than forty-eight hours prior to the start of these "Barbara Nicholas Incidents" on May 24, 1998.

24) From May 24th, 1998 onward, an uncontrolled and very hostile working environment developed, owing to Ms. Nicholas' frequent obstruction, non-cooperation, refusal to follow valid orders; as well as her crude, personally abusive epithets, and her frequent threats of impending termination to the Plaintiff; ostensibly based on her kinship with the FSSC District Personal Manager, Alonzo Herring.

25) Additional incidents occurred on May 31st, June 7th, June 14th, and in fact on every single Sunday shift, where Ms. Nicholas and Plaintiff were jointly assigned by FSSC management.

26)   Following the incidents of June 7th, 1998,
where the Plaintiff was cruelly abused by Ms.
Nicholas with the epithets of "fat old pig" and
"motherfucker", at a time when he was still in
mourning for the recent death of his father, the
Plaintiff spoke by telephone with the District
Personnel Manager, Mr. Alonzo Herring, and also
sent a written notice to the FSSC Lotus Account
Manager, John Ashley, reporting his perception of
abuse by Ms. Nicholas, believed to be a violation
of civil rights statutes, based on the age-based
epithets by Ms. Nicholas, and the failure of FSSC
Managers, including Mr. Herring and Mr. Ashley,
timely to investigate and take remedial action.

27)   As a result of Plaintiff's whistle-blowing
against abusive activities of the step-daughter
of Alonzo Herring [the FSSC District Personnel
Manager], the Plaintiff, on July 2nd, 1998, was
summarily demoted from his position of **Weekend
Morning Shift Supervisor**, to the rank of a non-

supervisory security officer; and was also trans-
ferred to other FSSC client accounts, where he
was then repeatedly exposed to chlorinated fumes
from a swimming pool at one location, as well as
to multiple toxic, noxious, and/or allergenic
fumes, vapors, mists, and airborne irritants from
uncured paints, wood finishing chemicals, stains,
varnishes, epoxy, resins, asphalt, adhesives,
sealers, and other chemicals, such as latex, at
the second location, a building in the process of
construction, without certificate of occupancy.

28)    The Plaintiff was warned, by Defendant
#2, Ms. Feeley, in a face-to-face conference on
July 2, 1998 not to question his demotion/trans-
fer, under penalty of termination; nor to have
any further contact with his immediate, and now
past, Supervising Manager, John Ashley.

29)    As a result of the sustained, month-long
hostile work environment; the non-response of
FSSC Account Management to Plaintiff's written

complaints, warnings, advisories, and notices;
the continuing physical juxtaposition of Barbara
Nicholas and the Plaintiff on Sunday shifts; the
continuing obstruction, non-cooperation, and es-
calating abuse by Ms. Nicholas; and the summary,
initially unexplained, [then, later, explained by
pretext], demotion and transfer of the Plaintiff
from LDC, to new assignments, characterized by
by frequent, repeated, exposures to multiple,
uncured, toxic, noxious, allergenic chemicals, as
well as to alternating extremes of heat and cold,
the Plaintiff within only four days of his new
assignments, developed various neurological
deficits, somatic anomalies,  including frequent
bouts of depression, anxiety, manic behavior, ir-
ratability; as well as numerous manifest physical
syndromes, including persistent insomnia, nervous
exhaustion, fatigue,  disruption of the circadian
sleep pattern, migraine-type headaches, nausea,
vomiting, diarrhea, sweat, high temperature, sore
throat, dehydration, incontinence, thirst, sinus
problems, and persistent muscle pain.  The multi-

plicity of ills and their tendency to persist and
intensify over time, ultimately required medical
consultation, physician-prescribed, psycho-tropic
medications, and consequential, short-term loss
of earnings capacity; which, in turn, resulted in
the filing of a Workers' Compensation Claim with
the Mass. Department of Industrial Accidents.

30)    Throughout the morning on July 8, 1998, the
Plaintiff made numerous phone calls to Defendant
#2, Ms. Feeley at her Office in Boston.  These
calls were all intercepted by an assistant, who
offered various excuses why the Defendant Ms.
Feeley could not talk to the Plaintiff.  She was
ostensibly "on the phone", "in conference", "was
away on break", "had gone to the ladies' room",
"had left for lunch", etc.   The  stated purpose
of these multiple phone calls was to report the
Plaintiff's work-related illness, to obtain in-
structions on how to obtain medical consultation
and assistance, and to request forms for the re-
porting of a perceived, industrial illness.

Page 17

31)   It became apparent to the Plaintiff, after
2 days of non-answered phone calls to Defendant
#2, Ms. Feeley, that his many attempts to report
his work-related illness were being detrimentally
boycotted by Ms. Feeley, who was in her Office
on July 8th and 10th , according to the FSSC
telephone receptionist or switchboard operator.

32)   Accordingly, on or about July 10th, the
Plaintiff made a telephone call to Defendant #1,
Ms. Mahoney, Security Services Manager for LDC.
He related to Ms. Mahoney that his purpose in
contacting her was three-fold.  First, to notify
LDC that very serious and unaddressed personnel
incidents, linked to his perceived debilitation,
had taken place on LDC property. Secondly, to
elicit Ms. Mahoney's good offices in causing
Defendant #2, Ms. Feeley to cease her boycott
of his prior telephone calls to report what he
believed to be work-related illness, resulting
directly from the month-long series of so-called

Page 18

"Barbara Nicholas Incidents" and their adminis-
trative aftermath. Thirdly, to request that all
documents, surveillance videotapes, and e-mail
files, stored within LDC computers, and bearing
upon the so-called "Barbara Nicholas Incidents"
should all be preserved by LDC, in the event that
litigation between the Plaintiff and FSSC might
become necessary to recover medical expenses and
lost-wage damages.

33)   A Workers' Compensation Claim was filed by
the Plaintiff. The claim was subsequently denied
and dismissed by the Massachusetts Department of
Industrial Accidents.   This denial and dismissal
was appealed to the Massachusetts Appeals Court,
where it is currently still under deliberation.

## ALLEGATIONS

34)   In the course of Discovery and Disclosure
for the Worker's Compensation Claim, on December
24, 2001, the Plaintiff received from Attorney

Page 19

Richard Mandel, then the Attorney of Record for
the Employer, a copy of an Internal Memo from Ms.
Feeley.   This Internal Memo was sent via e-mail,
and is entitled **Chronology of Lotus: K. Loughman
Incident.**   It was originally sent by Ms. Feeley
to six FSSC Executives or Managers,  namely: John
McFadden, Mike Phillips, Erin Arroyo, Joe Crow-
ley, Teresa Drisko, and Paul Caruso.  A copy of
this Internal Memo, originally dated July 13th ,
1998, will be introduced into evidence at trial.
In this Internal Memo, Ms. Feeley testifies and
quotes that Ms. Mahoney, in their telephone chat
of July 10th, 1998, referred to the ailing and
injured Plaintiff as a **"lunatic"**.

35)    The Plaintiff holds that he suffered both
**defamation** and **slander per se** from the false and
malicious statement of Maura Mahoney in her phone
conversation with Maura Feeley on July 10, 1998,
disparaging his emotional health, and/or intel-
lectual capacity; and reflecting implicitly and
negatively upon his capacity to carry out the

duties and responsibilities of a security guard.

36)    The Plaintiff further holds that he suf-
fered personal **defamation** and **libel per se,** when
this utterly false and malicious slander of Maura
Mahoney of LDC was then further and recklessly
re-published, without regard to its truth or
falsity, three days later, in an Internal Memo,
sent by Defendant Maura Feeley of FSSC to six
additional FSSC employees, thereby holding up the
ailing Plaintiff to that contempt, ridicule, and
opprobrium by FSSC Employees, which attaches to
the conditions of mental illness and/or mental
incompetence or deficiency, known as lunacy, a
condition which normally and historically has in-
volved the institutionalization of the "lunatic"
for his own safety and/or that of the public.

37)    The Plaintiff holds, and avers to the
Court, that, since his discovery of these acts of
**slander per se** and **libel per se,** as revealed to
him on December 24, 2001, by Attorney of Record

Richard Mandel, that he has suffered continuing emotional distress, anxiety, loss of self-esteem, humiliation, and embarrassment, all related to malicious damage and injury to his good name and reputation as a security service professional; first, by Defendant #1, Maura Mahoney, and then by Defendant #2, Maura Feeley.

## STATUTE OF LIMITATIONS

The Plaintiff avers to the Court that this Civil Action is timely filed, and in accordance with applicable Statutes of Limitation.  Massachusetts is a **Discovery State**, and the Statute of Limitations begins to run at that point when the Plaintiff **discovers** that he has suffered harm due to the actions of the Defendants.  In this particular case, discovery occurred on December 24, 2001, when Plaintiff opened and read material sent to him by Opposing Counsel, Richard Mandel. The three-year Statute of Limitations for the commencement of this Civil Action will expire on December 24, 2004.

Page 22

## DEMAND FOR RELIEF AND JUDGMENT

WHEREFORE, The Plaintiff demands judgment against Defendant #1 Maura Mahoney and against Defendant #3, Lotus Development Corp., as joint tortfeasor, for general damages in the amount of $50,000.00, **or as a jury shall determine to be just.**

The Plaintiff also demands judgment against Defendant #2, Maura Feeley and against Defendant #4, First Security Services Corporation, as joint tortfeasor, for general damages in the amount of $100,000.00, **or as a jury shall determine to be just.**

The Plaintiff further demands compensation for measurable economic loss, resulting from the pretext-based termination of his employment by FSSC, on November 25, 1998, **as a jury shall determine to be just.**

Page 23

The Plaintiff also demands judgment against all Defendants, in proportionate shares, **or as a jury shall determine to be just**, for all fees and reasonable expenses.

### DEMAND FOR JURY TRIAL

In accordance with the provisions of the Seventh Amendment to the U. S. Constitution; and in accordance with enabling Federal Rules of Civil Procedure, the Plaintiff hereby makes demand for trial of **all issues** in this Civil Action **by Jury**.

Respectfully submitted to this Honorable Court,

(Signed under the pains and penalties of perjury)

By and For Kevin P. Loughman, Plaintiff, Pro-Se

4 Marrigan Street, Arlington, MA, 02474
Telephone: 781-641-2756

October 28, 2004