FILED
IN CLERKS OFFICE

# UNITED STATES DISTRICT COURT
## DISTRICT OF [EASTERN] MASSACHUSETTS

2005 SEP 27 A 9: 25

### CIVIL ACTION NNUMBER:  04-CV-12316-WGY

U.S. DISTRICT COURT
DISTRICT OF MASS.

---

**KEVIN P. LOUGHMAN,**
A Citizen of the Commonwealth of Massachusetts,
Plaintiff

**vs.**

**MAURA MAHONEY,**
Now Believed to Be a Citizen of the State of Florida
In Her Former Capacity as Security Services Manager,
Lotus Development Corporation

**and**

**LOTUS DEVELOPMENT CORPORATION,**
Based in Cambridge, Massachusetts,
Formerly a Wholly-Owned Subsidiary of
INTERNATIONAL BUSINESS MACHINES CORPORATION, (IBM),
Believed to Be Based and Incorporated, in the State of New York,

**Defendants**

---

## PLAINTIFF'S MOTION IN OPPOSITION TO DEFENDANT'S MOTION FOR DISMISSAL OF ORIGINAL COMPLAINT

---

**By and For the Plaintiff, Pro-Se**

**Kevin P. Loughman**

**4 Marrigan Street,  Arlington,  Massachusetts,  02474**

**Telephone: 781-641-2756**

I, Kevin P. Loughman, Plaintiff Pro-Se in the above-captioned federal civil complaint, do hereby express and register with this Honorable Court, my OPPOSITION to the so-called "DEFENDANT'S MOTION TO DISMISS," as mailed on September 7th, 2005.

In support of his Opposition to Dismissal of his Complaint, the Plaintiff will argue below, both **falsification of fact** and **errors of law**, contained in the Motion to Dismiss, submitted to this Court by Attorney David Wilson.

## PART ONE:

## FALSIFICATION OF FACTS BY THE OPPOSING SIDE

On Page 7, ¶1, Counselor Wilson makes a really "goofy" statement, which is patently false, erroneous, and highly confusing to a person with just an ordinary command of the English Language. For the convenience of the Court, the Plaintiff quotes Attorney David Wilson directly: "Loughman fails to explain why nearly three years after his work-related injuries (in the form of filing the worker's compensation claim), **he first requested and saw the July 13, 1998 memo.**" Counselor Wilson seems to be implying that the Plaintiff initially made a **specific request** to see the July 13, 1998 memo, some three years along, during the course of the Worker's Compensation Case. According to Wilson's fabrication, this document was furnished in response to some kind of **specific request** from the Plaintiff; and that he is somehow at fault for "waiting" some three years, before making his request.

2

Attorney Wilson has been watching too much television, and his fabrication or "filling in the background with bunk" illustrates his difficulty in separating fact from fiction. Maybe, he is just not **detail-oriented**. At any rate, Plaintiff has **never** made a **specific** request for any kind of access to the July 13, 1998 memo (which memo opened the "Pandora's Box" of libel-slander-defamation claims, as causes of action separate and distinct from the pre-existing worker's compensation claims) for the very simple reason that **he was unaware of the existence of this offending memo, prior to December 24, 2001**. A copy of the offending memo of July 13, 1998 (Defendant's "Exhibit A") was attached to a letter from Richard Mandel (Counsel of Record for the Employer), with reference to his overdue and missing "notice of entry" into the DIA case below, which notice had not yet been provided to the Plaintiff, as required by DIA Regulations. Mandel failed to provide notice of entry for eleven months.

It makes no logical sense for this Court or for Attorney Wilson to seek a so-called "explanation" for an implicitly "delayed request" (**which request was never made in the first place**) for access to a document, the existence of which was totally unknown to the Plaintiff, until December 24, 2001. FSSC, the Employer in this case, was boycotting and obstructing Plaintiff's efforts to obtain full discovery and disclosure in the DIA case, including his efforts to obtain access to his **complete personnel file**, including documents pertaining to so-called "employee discipline."

Was it not the Irish Poet, William Butler Yeats who wrote: "Do I

but live where motley is worn?" Could he have been anticipating Counselor

Wilson's hyper-fractious logic and convoluted legal prose? Please, interpret

for me, Esteemed and Honorable Court, since I am not a lawyer and haven't

the *foggiest notion* of Counselor Wilson's meaning in this entire section of his

Motion! Could there be a mysterious, unfounded, unexplained, goofy, and/or

farcical set of circumstances, (as seems to be the case in the Mass. Workers'

Compensation Case) known only to Attorney Wilson, which renders his ob-

scure and confusing prose comprehensible to him? This Plaintiff, is not a

lawyer; he is not schooled in sophistry; nor has he yet discovered any sort of

"Rosetta Stone" to assist him in making sense out of legalistic double-speak.

Next, I expect he will inquire as to when I stopped beating my wife, and will

express his wonder and suspicion at my delay in answering such a query. In

order for me to understand this complex process, as a Pro-Se Plaintiff, it is

necessary that plain, simple, and consistent use of logic and English should

be employed to facilitate discussion and my understanding. Plaintiff requests

that Opposing Counsel should be directed to clarify his meaning or withdraw

this entire section of his Motion, as one which does not make logical sense.

This very confused and disoriented Plaintiff therefore calls upon this

Honorable Court to order or direct Esteemed Counselor Wilson to cite with

clarity, accuracy, precision, particularity, also page numbers and paragraph

numbers, any references to any materials which will support his "fabricated"

inference that this Plaintiff has ever made a **specific request**, either to the

4

Massachusetts Department of Industrial Accidents, or to the First Security
Services Corporation, for any kind of access to the so-called memo of July
13th, 1998. This Memo is referenced as Defendant's "Exhibit A".

Although by law a part of the Plaintiff's personnel file, this memo,
dealing with the subject of "employee discipline", was never included in any
materials submitted to the DIA (**at any time**, either **before** or **after** December
2001); nor to the Plaintiff, at any time, prior to December 24th, 2001. The
fabrication of a so-called "factual inference" on the part of Attorney Wilson
gives rise to legitimate complaints of ethical lapses or violations on his part,
and also diminishes the [already shallow] well of good-will existing between
the Plaintiff and the Defendants, thus making this case more time-consuming,
expensive for all parties, and less efficient for this Court to settle and resolve.

Likewise, the denial by Maura Mahoney, of having had a telephone
conversation with the Plaintiff on July 10th, 1998, diminishes her credibility
and also taxes good will. See "Motion to Dismiss", page 4, footnote 4. The
attention of this Court is, accordingly, and also very respectfully directed to
page two, paragraph 9, of Defendant's "Exhibit A", Maura Feeley's memo of
July 13th, 1998, which memo also reports, confirms, corroborates, and veri-
fies a certain phone chat between Maura Mahoney and the Plaintiff on July
10th, 1998. If the Plaintiff and Maura Feeley of First Security Services
Corporation are "telling the truth" with respect to this particular phone call,
then Maura Mahoney, in her so-called "denial" of the reality of this phone

5

call, must be guilty of factual falsification. Or, as Lady Augusta Gregory wrote in one of her delightful, one-act comedies, Maura Mahoney is "tellin' lies, tellin' lies, tellin' lies!" Of course, in discussing the story of her involvement in this case with her Legal Counsel, Maura Mahoney is not sworn as a witness ___to tell the truth___. But, how, I venture to ask this Court, in the interest of fairness and justice, shall we get to the bottom of factual discrepancies, in this dreadful, long-of-tooth, and also compounding litigation? The Plaintiff holds that Maura Mahoney must eventually testify under oath, if we are ever to get to the underlying truth.

## PART TWO:

### ERRORS OF LAW ON THE PART OF OPPOSING SIDE

To the best of his knowledge and understanding, the Plaintiff discerns that his Complaint is challenged by Esteemed Counselor David Wilson on three separate and distinct legal grounds:

First, that the Complaint is barred by the applicable statute of limitation, and that the so-called "Discovery Rule" is held not to apply.

Secondly, that the offending words, as spoken by the Defendant Maura Mahoney to Maura Feeley, do not, when understood in their full context and circumstances, constitute actionable defamation or slander, even if she did speak them in a telephone call she denies having made to Maura Feeley on July 10th, 1998.

6

Third, that Defendant Maura Mahoney had a so-called "business privilege", which immunizes her, unless it can be shown that she abused her alleged privilege.

The Plaintiff shall address each of these defenses in the pages below.

### A.    The Statute of Limitations Does Not Bar Plaintiff's Claim

Within Massachusetts, **notice of injury is required**, in addition to actual injury itself in order to toll time-limits for the pursuit of litigation. This concept is generally known as "The Discovery Rule". Generally speaking, the statute of limitations here in Massachusetts for defamation and slander is three years "after the cause of action accrues". See: M.G.L. c. 260, § 2A and § 4. According to the opinion and decision by the Supreme Judicial Court (SJC) of Massachusetts in the case of *Flynn v. Associated Press*, 401 Mass. 776, 1988: "In determining when a cause of action 'accrues,' we are guided by the principle that "a cause of action accrues on the happening of an event likely to put the plaintiff on notice."" The Plaintiff has previously stated in his Complaint [at ¶ 34] that he **first** became aware of the slander and libel of July, 1998, only when he received a copy of Defendant's "Exhibit A" on December 24th, 2001. (Plaintiff's original Complaint was made under the pains and penalties of perjury). As previously stated, this Defendant's "Exhibit A" document was attached without comment or explanation to correspondence from Employer' Attorney of Record at that time, Richard Mandel.

See also: *Zereski v. Am. Postal Workers Union,* 1998 WL 1181769 *4

(Mass. Super 1998) (the statute of limitations on a libel claim does not run un

til plaintiff could have seen publication). Of course, this instant Complaint in

volves slander, which is **spoken**, rather than libel, which is **written**. Attorney

Wilson is quite correct in his statement that there appears to be no complaint

of libel against Defendant Maura Mahoney at this present time, since no evi-

evidence of written defamation (libel) has yet been discovered, with respect to

the actions of Defendant Maura Mahoney.

The Plaintiff holds that with respect to the spoken slander, the under-

lying principle of "discovery" or "knowledge of injury" likewise logically

holds for cases of slander. It is actually harder to discover slander, owing to it

spoken, transitory nature, than it is to discover libel, which is memorialized o

recorded in written form. The Plaintiff holds that, whether we are talking of

spoken slander or written libel, the Discovery Rule in Massachusetts operates

as a stay on the tolling of the statute of limitations, until such time as the vic-

tim of the spoken slander acquires knowledge of his injury. In this instant

case, knowledge of the spoken slander and of the written libel were both

acquired simultaneously, by means of the memo of July 13th, 1998, again

referred to as Defendant's "Exhibit A."

Opposing Counsel states : "we know of no Massachusetts Court that

has applied the 'Discovery Rule' to slander claims." See page 6, footnote 6.

Since Massachusetts Law applies to this instant case, it is incumbent upon thi

Honorable Court, acting in the place of a Massachusetts Court, to assess the
"Discovery Rule" as it applies or as it does not apply in this particular case,
where discovery of the slander has been obstructed and boycotted not by ac-
tion of the Defendant in this case, Maura Mahoney; but rather by action of
Defendant First Security Services Corporation in the Defamation and Libel
Action within Middlesex County Superior Court as: "MICV-2004-04207-E".

While the cases cited by Opposing Counsel (on page 6, footnote 6)
may be of some passing interest to Massachusetts-based Courts, this instant
case can only be decided by a Massachusetts Court, based upon the applica-
tion of Massachusetts Law. Numerous states do not recognize the principles
of law subsumed by the "Discovery Rule", which operates in Massachusetts,
and also in a number of other States, but by no means all other states. Hence,
this Plaintiff requests formal rulings of law in connection with the application
of the Discovery Rule and all other Massachusetts Laws, in connection with
this complaint for defamation and slander. The Plaintiff avers to the Court
that it does not make logical sense for the Statute of Limitations to be the
same three years for both libel and slander, but for the Discovery Rule to
operate only with respect to libel, but not with respect to slander, within
Massachusetts.

In the Workers' Compensation Case, before the Mass. Department of
Industrial Accidents, Discovery and Disclosure in connection with the Plain-
tiff's personnel file, conduct, work history, disciplinary complaints and issues

9

is enabled by M.G.L. c. 149, §52C, which provides that the Employer **must produce and make available** copies of any/all documents in its possession, dealing with the subject of **"employee discipline".** The employer (and its insurer) in this case have repeatedly failed to comply with this law, which, in the course of the Workers' Compensation Case, was repeatedly invoked and cited, and referenced, both to the Employer (directly by the Plaintiff) and to the Mass. DIA --- in literally hundreds of pages of Motions, Memos, Letters, and Complaints. This Plaintiff will seek the specific guidance of this Court in setting limits on the nature and numbers of pages of case documents, which record his reasonable and rational efforts to effect Discovery and Disclosure of all of his personnel records in the case before the DIA. The Memo of July 13th, 1998-----which also reports the slander of July 10th, 1998 (on the part of Defendant Maura Mahoney) was with-held from the Plaintiff until December 24, 2001, when it was attached, without comment, to correspondence from the Employer's (then) Attorney of Record, dealing with the subject of obstructed notice-of-entry obligations on the Part of the Employer's Attorney of Record, who also failed to comply with DIA notice of entry rules for eleven months.

All of this is not to say, that in connection with the then on-going case at the Mass. DIA, that the Plaintiff was lax or derelict in his efforts to obtain **complete and unrestricted access** to his so-called personnel file. Opposing Counsel seems to imply that "a reasonably prudent person in his situation" could have discovered the contents of this confidential telephone call between

10

Maura Mahoney and Maura Feeley on July 10th, 1998. (This is a phone call which Defendant Maura Mahoney, herself, denies ever took place, in the first place).

It is obvious that Counselor Wilson for Defendant Maura Mahoney is woefully ignorant of the six-year, pro-active efforts of the Plaintiff to obtain full access to his personnel records, more especially in view of the so-called "bogus" demotion and transfer of July 2, 1998, arising out of the so-called "Barbara Nicholas Incidents" of May, June, and July 1998. Barbara Nicholas was the step-daughter of a First Security Personnel Officer; her deficient task performance, violation of company policies, and her frequent rudeness to her fellow workers, resulted in the Plaintiff's short-term debilitation, giving rise to his Worker's Compensation Claim in July, 1998. The Worker's Compensation Claim was based upon a hostile work environment (until July 2, 1998) and also upon multiple unprotected exposures to toxic, noxious, or allergenic chemicals on July 2, 3, 4, and 5, 1998.

The fact that he was unsuccessful in his frequent, pro-active efforts to obtain legally mandated access to his personnel and disciplinary records, does not mean nor imply that he did not make reasonable, and sustained efforts to do so. Again, the guidance of the Court will be sought with reference to the amount of case documents which are available and which support and sustain the Plaintiff's claims to a boycotted and obstructed Discovery and Disclosure Process, which was brought to the attention of the DIA Authorities on several occasions by the Plaintiff in this instant case.

The case before the DIA involved bogus, undocumented charges of employee abuse by the Plaintiff in this instant case. Accordingly, this Plainti motioned for full disclosure of his **full personnel file**, which is **statutorily defined** to include all materials in possession of the Employer, pertaining to the subject of **employee discipline**. See: M.G.L. c. 149, § 52C. For several months, the personnel file could not be located at all by the Employer, which was, at that time a wholly-owned subsidiary of the "legendary" Pinkerton's [Detective] Agency!!! When it was finally yielded up, it came with no table of contents or index. Numerous items were missing; both general materials, like job descriptions, annual performance evaluations [for 1994, 1995, 1996, 1997], and other "skills credentials," such as the Red Cross First Aid and CPF Training Documentation for 1997, as well as numerous, alleged, discipline-related documents, so-called "serious incident reports," written complaints of employee abuse by this Plaintiff, allegedly submitted by Security Officers, un-der his immediate supervision; and internal investigative reports of these so-called abuse incidents.

The case-record in the underlying Worker's Compensation Complaint at the DIA runs to over 4,000 pages, of which about 3,000 pages are single-spaced letters and memos. This 3,000 pages also includes in excess of one hundred pages of letters, memoranda, complaints, and remonstrance, addres-sed to both the Presiding DIA Administrative Judge and also to the Senior Judge of the DIA, as well as to Counsel for the Employer, on the subject of

the procedural issue of continuing non-compliance, boycott and obstruction, on the part of First Security Services Corporation with their legal obligations under M.G.L. c. 149, § 52C, as well as with their legal obligations to comply with DIA-authorized subpoenas, in general. This body of complaints, memos and constant remonstrance has been largely ignored and/or suppressed by the DIA itself during the Hearing Process, because it raises, by implication, very serious issues of judicial non-competence, partiality, and violation of judicial ethics, on the part of the Presiding Judge within the DIA. This concept of judicially-condoned, obstructed discovery and disclosure is sometimes referred to as unclean hands, and it justly applies to the conduct of First Security Services, in the Worker's Compensation Case. Plaintiff now postulates that documents were with-held by the Employer until after the so-called Statute of Limitations expired, because they were **prima facie, defamatory, libelous, as well as slanderous.**

Upon authorization or instruction by this Honorable Court, the Plaintiff stands ready and well-able to document his reasonable and prudent efforts over a six-year period to obtain full and unrestricted access to his "personnel file," including all documents in possession of the Employer, pertaining to the Plaintiff's so-called "disciplinary demotion and transfer" which took place on July 2, 1998. He will seek to subpoena records, directly from the Mass. DIA, as well as from First Security Services Corporation and Lotus Development.

As a result of this "disciplinary demotion and transfer," the Plaintiff

ceased to be assigned to the First Security/Lotus Development Account, and instead was re-assigned to the First Security/GTE Company Account, and to its Internetworking Division, based in Burlington, and also, for a short very time, to the First Security/Abt Associates Account, based in Cambridge.

For a recent judicial assessment/opinion on the obligations of an employer to provide an employee with **full** access to his personnel records, **not excluding disciplinary records**, the Plaintiff respectfully refers this Court to the SJC decision/opinion in our Sister State of New Hampshire in the case of *Harding v Walmart Stores.* The New Hampshire disciplinary records disclosure law is very similar to that in Massachusetts.

## CONCLUSION ON "STATUTE OF LIMITATIONS" ISSUES

The Plaintiff concludes as follows:

1) That the Discovery Rule is applicable in this defamation and slander case.

2) That the cause of action began to accrue in this case on that day when the Plaintiff **first became aware of his defamatory** injury by spoken slander by Defendant Maura Mahoney, that is, on December 24th, 2001.

3) That the statutory period of thirty-six months for the filing this defamation and slander case became fully tolled only on December 24, 2004. and not on July 10, 2001, as implicitly claimed by Opposing Counselor David Wilson.

4) Since this defamation/slander complaint was filed on October 29, 2004, some sixty-days in advance of the expiration of the statute of limitations, the

inevitable conclusion must be that this case is **timely filed**, in accordance wit

applicable statutes of limitation, as modified, allowed, and enabled by the op-

eration of the Massachusetts Discovery Rule. This case should, accordingly,

be allowed to move forward, without further obstruction, on this point of law

## B.    Understood In Context, Defendant's Statement Is Defamatory

With respect to the defamatory nature of Maura Mahoney's spoken

words on July 10, 1998, the Plaintiff respectfully references this Court to the

following legal annotation: *23 A.L.R. 3d 652*, which collects cases, based

upon the "actionability" of imputing to private persons, mental disorder or

incapacity. As a courtesy to the Court, this annotation has been reproduced

as Plaintiff's "Appendix A". In particular, See §5 and §6, on pages 8-10.

This treatise concludes that oral imputations of insanity or impairment

of mental facilities have generally been held to be **slanderous per se**, when

spoken with reference to the business, employment, occupation, office, or

profession of the private person about whom they are spoken.

The Plaintiff was employed as a security guard, assigned to Lotus

Development from June, 1994 to July 2, 1998. In addition to undertaking

building tours and inspections, he was an emergency responder to events and

situations, such as the following: property thefts, burglaries, personnel stal-

king incidents, unauthorized entry, heart attacks, child birth, epileptic and

diabetic comas, slip-and-fall-accidents, fires, flooding, false alarms, elevator

entrapments,  shooting incidents (in a nearby shopping mall) suicide on

company property, indecent exposure and sexual assault incidents, automobi accidents, lockouts, vandalism, loitering on company property, etc., etc., etc. Even in the more care-free days of 1998 (prior to the sobering security-lapse-events of 9/11), the day-to-day business of a security professional was a very serious piece of work, indeed, and not a fit object for mental retardation jokes and/or epithets. An "insane person" would not be able to provide the level of skills, cognition, quick and sound response to any of the myriad of emergency or even routine situations, which were/are likely to arise in the course of the operation of a high-rise office building, employing hundreds, if not small thousands of workers, on a daily basis. The Plaintiff was, at the insistence of Lotus Development, Red-Cross Certified in First Aid, and also in Cardio-Pulmonary Resuscitation (CPR). Security work can involve life-and-death issues, at the drop of a proverbial hat, suddenly and without any warning. Inferences and imputations of diminished mental capacity are, accordingly, detrimental attacks on his abilities to carry out the normal duties and ob-ligations of his profession, and in this sense proscribed by numerous relevant sections of that body of common-law known as The Second Restatement of Torts. See, in particular, §573.

The above-referenced annotation provides numerous citations to cases involving imputations as to insanity and to mental deficiency not amounting to insanity, both by written and by oral imputations. See in particular: *Brauer v. Globe Newspaper Co.* (1966) 351 Mass. 53. For a very similar case not involving "insanity" or "lunacy", see: *Ravnikar v. Bogojavlensky*, 438 Mass.

627, where the defendant slandered his medical colleague by stating to a prospective patient that the plaintiff "was dying of cancer", a false statement of medical fact, made without any knowledge on the part of the Defendant of his colleague's true medical condition.

The attention of this Court is also directed to the Article (at Appendix "B"), titled *"Still Crazy After All These Years: The Enduring Defamatory Power of Mental Disorder"*, by Karen M Markin, which appeared in **29 Law and Psychology Review 155**. This extensive review of the history of defamation law, applied to imputations of mental illness, sheds light on (slowly) evolving social constructions of mental illness, and the considerable (enduring) social stigma that attaches to false imputations or inferences relating to mental illness. The Plaintiff respectfully directs the attention of this Honorable Court to: *Weyrich v. New Republic, Inc.*, found at 235 F 3d 617, 623 (D.C. Cir. 2001). This article discusses the Weyrich Case.

Distinguished Opposing Counsel tries to "dance around" Defendant's factual, but false and erroneous **statement of fact**, regarding Plaintiff's state of mind or mental health, by adapting the "trappings" of constitutionally protected opinion. But the "language of pure opinion" is itself distinct. A pure opinion is couched in the language of opinion. "I think". "I believe that". "It is my opinion that", etc. In addition, reasons providing the basis for an opinion are stated. "I think that Kevin Loughman is a "lunatic" ***because*** he refuses to wear socks to work!" Absent, the clear and precise language of opinion, **which we do not see in this case**, we must conclude that Maura

17

Mahoney did express a false, erroneous, slanderous, and also defamatory

statement of fact, on July 10, 1998 in her phone chat with Maura Feeley.

### C.    Defendant Maura Mahoney Did Not Have Any Legitimate "Business Privilege" to Comment on the Plaintiff's, Medical and/or Legal Status, Mental Health, or his "State of Mind" on July 10, 1998.

On Page 10, ¶ 1 and continuing over to Page 11, ¶ 1 Attorney

Wilson makes the following assertion or averment: ".........Mahoney clearly

had a legitimate business reason---insuring appropriate staffing of LDC's se-

curity force by competent personnel---to comment upon Loughman's fitness

to provide security services in connection with the contract between FSSC and

LDC." There is an **"essential flaw"** in Counselor Wilson's bald assertion and

its underlying rationale, and that is this: The Plaintiff's so-called "fitness or

non-fitness," had absolutely nothing to do with any contract provisions, ex-

isting between FSSC and LDC on July 10th, 1998, the reported date of Maura

Mahoney's spoken defamation and slander. On July 2, 1998, the Plaintiff was

arbitrarily, summarily, and also on pretext, demoted from his supervisory job

at the FSSC/Lotus Development Account, and transferred to another FSSC

Client, namely GTE/Inter-Networking Division in Burlington, Mass. Please

refer to the following documents: Defendant's "Exhibit A" at Page 2, entries

for "Thursday, July 2nd , [1998]". The salient statements from this memo are

as follows: "When I met with Kevin.........I then set up a transfer to the GTE-

Burlington facility for the same working days he had at Lotus and same pay

rate. I also provided him with a copy of the letter which referred to this

matter."

The Plaintiff states, avers, and argues to this Court, that upon his trans

fer to the FSSC/General Telephone Account, on July 2nd, 1998, all so-called

and previously-existing "Business Privilege," on the part of Defendants Maur

Mahoney and/or the Lotus Development Corporation to comment concerning

the fitness for employment, and/or mental status, and/or legal status of this

Plaintiff, Kevin P. Loughman was extinguished, in favor of the assumption of

those same privileges by General Telephone & Electronics Company, Inter-

Networking Division, ("GTE/I") to which the Plaintiff was assigned by the

FSSC Assistant District Manager, Maura Feeley on July 2nd, 1998.

Thus, on July 10, 1998, a week after his re-assignment, there existed

no "Business Connection" of any kind, whatsoever between this Plaintiff and

Lotus Development Corporation, upon which a claim to "Business Privilege"

on the part of Lotus could stand.  There is no contract between FSSC and the

Lotus Development Corporation, which extends privilege to Lotus to super-

vise, comment upon, manage, or in any way interfere with the security opera-

tions of FSSC employees, assigned to other, non-Lotus affiliated accounts.

In addition, Maura Mahoney herself has acknowledged that the con-

troversy surrounding the Plaintiff's arbitrary, summary, and pretext-based

transfer was, if the Plaintiff is quoting the July 13, 1998 memo correctly, "a

FSSC matter."  See Defendant's "Exhibit A", page 2, July 10[th] heading.

## CONCLUSION ON "PRIVILEGE" ISSUE

The Plaintiff concludes, based upon his transfer from the FSSC/Lotus Development Account to the FSSC/GTE-I Account, on July 2, 1998, that any prior existing "Business Privilege" which Lotus Development may have once previously enjoyed, **was extinguished** in favor of the assumption of those same privileges at the Plaintiff's new security services assignment, GTE/I (General Telephone & Electronics/Inter-Networking Division), in Burlington. Accordingly, Attorney Wilson's baseless and invalid claim for "Business Privilege" on the part of Defendant Maura Mahoney and/or Lotus Developpment Corporation should be disallowed by this Honorable Court, and this instant Complaint, should, likewise, be allowed to move forward on this third and final contested legal basis as well, without further delay and obstruction.

## GENERAL CONCLUSIONS

The Plaintiff has argued and shown that The Discovery Rule Applies to his case; that the telephone communication from Maura Mahoney to Maura Feeley on July 10, 1998 was defamatory and slanderous per se; and that no so-called "Business Privilege" existed on the part of Maura Mahoney to attack or discuss the Plaintiff's mental health status on July 10, 1998. Accordingly, this case should be allowed to move forward to full Discovery and Disclosure and eventual Hearing before a jury, as prescribed by law.

Respectfully submitted to this Honorable Court,
(Signed under the pains and penalties of perjury)

Kevin P. Loughman, Plaintiff, Pro-Se, September 27th, 2005

## CERTIFICATE OF SERVICE

I, Kevin P. Loughman, Plaintiff in this instant case, hereby certify that on the above date, I served the above document by mailing a copy of same, postage pre-paid, to Attorney David Bliss Wilson, Co-Counsel for the Defendants, at the Law Firm of Robinson & Cole, L.L.P., One Boston Place, Boston, MA 02108-4404.

Kevin P. Loughman, Plaintiff, Pro-Se, September 27th, 2005