UNITED STATES DISTRICT COURT
DISTRICT OF [EASTERN] MASSACHUSETTS

CIVIL ACTION NNUMBER:   04-CV-12316-WGY

---

**KEVIN P. LOUGHMAN,**
A Citizen of the Commonwealth of Massachusetts,
Plaintiff

**vs.**

**MAURA MAHONEY,**
Now Believed to Be a Citizen of the State of Florida
In Her Former Capacity as Security Services Manager,
Lotus Development Corporation

**and**

**LOTUS DEVELOPMENT CORPORATION,**
Based in Cambridge, Massachusetts,
Formerly a Wholly-Owned Subsidiary of
INTERNATIONAL BUSINESS MACHINES CORPORATION, (IBM),
Believed to Be Based and Incorporated, in the State of New York,

**Defendants**

---

**PLAINTIFF'S APPENDIX "B"**
**"STILL CRAZY AFTER ALL THESE YEARS: THE**
**ENDURING DEFAMATORY POWER OF MENTAL ILLNESS"**
**BY KAREN M. MARKIN**
**29 LAW AND PSYCHOLOGY REVIEW, SPRING 2005**

---

By and For the Plaintiff, Pro-Se

Kevin P. Loughman

4 Marrigan Street,  Arlington,  Massachusetts,  02474

Telephone: 781-641-2756



**Search Terms: still crazy after all these years**

FOCUS™ [                ]    Search Within Results    Search

Prin  **Email**

Full    ◀◀previous **Document 3 o**    next ▶▶

Copyright (c) 2005 Law and Psychology Review
Law and Psychology Review

Spring, 2005

29 Law & Psychol. Rev. 155

**LENGTH:** 19197 words

CONTRIBUTED ARTICLE: **STILL CRAZY AFTER ALL THESE YEARS:** THE ENDURING DEFAMATORY POWER MENTAL DISORDER

**NAME:** Karen M. Markin *

**BIO:**

* Director of Research Development, University of Rhode Island, Research Office, 70 Lower College Road, ; Kingston, RI 02881 USA, 401.874.2635 (voice), 401.874.7044 (fax), kmarkin@uri.edu (email).

**SUMMARY:**

... According to a U.S. Surgeon General's report released in 1999, the stigma surrounding mental disorder intensified over the past forty years. ... In the legal realm, defamation law protects reputation and provides appropriate avenue for studying the stigma that continues to be associated with mental disorder. ... Crucia    the discussion of these cases is an understanding of several sociological and historical concepts: the notion of s    na; the medicalization of mental disorder; and shifting constructions of reputation. ... Reputation typically was rega    d as property in cases where allegations of mental disorder cost the plaintiffs their jobs or professional reputatio    :uch as *Moore v. Francis,* a case filed by a bank teller whose "mental condition was not entirely good," according to    iors published in the local newspaper. ... Other cases arose when social authorities labeled someone mentally di    dered. ... During this time period, mental disorder was established by the plaintiff's conduct in society, a physician diagnosis or a combination of the two. ... Mental disorder was established during this time period by a phys    n's diagnosis, judicial decree or the plaintiff's behavior. ... It is apparent from the dozens of opinions reviewed    ve that allegations of mental disorder continue to be considered defamatory, and that plaintiffs have documented s    ficant harm resulting from them. ...

**TEXT:**
[*155] I. INTRODUCTION

When an article in *The New Republic* claimed that conservative political leader Paul Weyrich had once been    rcome by irrational anger such that he was "frothing at the mouth," n1 the politician filed a libel suit, saying the ar    ъ portrayed him as mentally unsound. n2 The U.S. Court of Appeals for the District of Columbia Circuit agreec    th Weyrich, and in 2001 reversed the district court's dismissal of the claim. n3 "There is no doubt that a reasor    le person . . . could very well conclude that appellant is an emotionally unstable individual unfit for his trade o profession," the court stated. n4

According to a U.S. Surgeon General's report released in 1999, the stigma surrounding mental disorder has intensified over the past forty years. n5 As this Article will show, the Surgeon General's assertion is support    >y court decisions regarding allegations of mental disorders. n6 The frequency of decisions on this issue actuall increased toward the end of the twentieth century. The continuing stigma associated with mental disorders .    ns paradoxical, given the widespread use of pharmaceutical treatments for mental conditions n7 and the frequ discussion of mental [*156] disorder in the popular media. n8 This Article examines why, despite effective

treatments for mental disorder, and its apparent social acceptance based on its prominence in popular cul    :, legal
claims continue to arise based on an imputation of this condition, and how these claims are adjudicated.

Far from being limited to the personal shame of the stigmatized, the stigma associated with mental disord
ultimately has a profound impact on the productivity of established market economies. A worldwide study    ealed
that mental disorder is second to cardiovascular conditions in the disease burden it places on such econom    . n9 In
the United States, much of this disorder goes untreated. According to the 1999 Surgeon General's report,    rly two-
thirds of individuals with diagnosable mental disorders do not seek treatment because of the stigma assoc    d with
doing so. n10 The report emphasized that stigma is the "most formidable obstacle to future progress in th    ena of
mental illness and health." n11 Psychiatric research at the individual level has shown that stigma can pose    barrier
to the recovery of people with mental disorder in several important ways. n12 Reports in the popular medi    rovide
evidence of the continuing stigma associated with mental disorder. A *New York Times Magazine* article on    red
soldiers returning from Iraq in 2004 mentioned veterans' reluctance to seek psychological help, despite th    auma
they had experienced, out of fear it would damage their future career prospects. n13 The problem of stigm    zation is
so serious that the National Institutes of Health in 2004 [*157] was funding grant proposals to reduce m    al illness
stigma and discrimination. n14

Given the steep cost of mental disorder, and the role that stigma plays in perpetuating these costs, it is im    tant to
understand the extent to which mental disorder continues to be stigmatized. The law provides an apt way    xamine
this stigmatization. From a sociological perspective, laws arise in part from the values of a society. n15 An    active
legal system legitimizes the rules by which a society lives. n16 Judicial decisions represent an authoritative
interpretation of the rules that compose the legal system. n17 Thus court opinions can provide evidence at    : the
current relationship between stigma and mental disorder.

In the legal realm, defamation law protects reputation and provides an appropriate avenue for studying the    igma
that continues to be associated with mental disorder. A defamatory statement is one that "tends to expose    berson
to hatred, contempt, or aversion, or to induce an evil or unsavory opinion of him in the minds of a substan
number in the community." n18 This definition obviously is open to interpretation. Legal scholars say that
contemporary claims, a statement generally needs to suggest moral opprobrium to be actionable. n19 "Wh    er a
statement is defamatory is a value-laden inquiry, and moral values are not universally shared." n20 Courts    ve held
that such matters must be viewed from the perspective of "right-thinking" people. n21

However, "what right-thinking or respectable people think changes over time." n22 For example, the law is    rrently
unsettled as to whether it can be defamatory to call a person homosexual. n23 *West's Digest* continues to    an
imputation of mental derangement as defamatory. n24 This Article examines whether it still can be defama    y to
accuse a person of being mentally disordered. It reviews virtually all published court opinions to [*158] d    mine
whether such an allegation is defamatory, and the extent to which the law legitimates the stigma associate    ith this
condition. n25

As with any methodology, the approach has limitations. By relying on published court opinions, the Article    essarily
emphasizes reported appellate cases. It therefore does not deal with all litigation arising from allegations o    antal
disorder. Nor does the Article measure whether or to what extent the courts are responsible for perpetuatir    ne
stigma associated with mental disorder. Rather, it simply describes how courts have dealt with this issue, o    ne
premise that the courts' decisions are an important barometer of societal values.

Language used to describe what is now called mental disorder has changed over the years; previous terms    uded
"mad, maniacal, insane or lunatic." n26 Choice of language necessarily reflects a particular perspective on t    topic.
This Article uses the contemporary term of mental disorder for the author's own comments. For other discu    in, it
uses the language found in source materials. Thus, it includes the term "mental derangement" from *West's    est* as
well.

## II. UNDERLYING CONCEPTS: STIGMA, MEDICALIZATION AND REPUTATION

Crucial to the discussion of these cases is an understanding of several sociological and historical concepts: t    notion
of stigma; the medicalization of mental disorder; and shifting constructions of reputation. An in-depth exam    tion of
these topics is beyond the scope of this Article. Instead, this section provides only the background necessar    )
elucidate the subsequent case analysis.

### A. Stigma and the Medicalization of Mental Disorder

For centuries, mental disorder has been associated with stigma, n27 which probably is rooted in the "misgu    l split
between mind and body first proposed by Descartes." n28 Sociologist Erving Goffman used stigma to refer t    an

attribute that is deeply discrediting," n29 and his definition has [*159] gained acceptance by others stud    ┐ the
concept. n30 Stigma is attached to the violation of social norms; such violation can be considered devianc    ∶31
From the sociological perspective, deviance represents a social judgment that is culturally relative. n32 It    ocially
created and enforced, usually by powerful groups over people with less power. n33 Those with the authori    o define
certain behaviors exert substantial social control. n34 Recent social scientific research has confirmed this,    wing
that the class, status and power of stigmatizer affect the impact of stigmatization. n35

Although the association of mental disorder with stigma has remained stable over the years, the authority    king
social judgments about it has changed. During the Middle Ages, the Church was a major agent of social co    ɔl. n36
A theological conception of madness dominated, and mental disorder was considered punishment for sin.    During
these and subsequent centuries, families typically were responsible for looking after mentally disordered n    bers at
home. The condition was viewed as shameful, due to its linkage to diabolical possession and hereditary tai    so
families tried to hide the existence of these members. n38

By the middle of the seventeenth century, capitalism began to emerge, and society sought a way to segre∙    those
who were not self-sufficient. The mentally disordered, criminals and the poor were placed in institutions. n    By the
middle of the eighteenth century, the mentally disordered were placed in institutions separate from those    were
fit to serve as potential workers. n40 This separate treatment system for those with mental disorder, apart    m the
mainstream somatic health system, is another factor that probably contributes to the stigmatization of me
disorder. n41 Physicians gradually gained power over admission to these institutions, marking a shift away    m the
Church as the agent of social control for mental disorder, n42 and the medicalization of mental disorder in    dern
times was well under way. Today physicians represent a potent force in the social control of mental disorde    Social
scientific research shows that [*160] people who are labeled mentally ill by physicians can find it difficult    efute
the categorization. n43

The institutionalization of the mentally disordered that was commonplace in the past few centuries was de∙
stigmatizing. Instead of being shunned as sinners or agents of the devil, they were "subjected to compulsc    and
coercive medical treatment, usually under conditions of confinement and forfeiture of civil rights," accordin    social
historian Roy Porter. n44 Unlike those suffering from somatic diseases, "the seriously mentally ill . . . have    n
subjected to a transformation in their legal status which has rendered their state more akin to criminals th∶    hat of
the sick." n45 The madhouse, which later was dubbed the asylum or the mental hospital, was more like a    on than
an infirmary. n46 Only in the past several decades has the trend toward the institutionalization of the men    '
disordered been reversed. n47

Today, empirical evidence suggests that the stigma of mental disorder stems from the public's association    uch
disorder with violence. n48 Perceptions of mental disorder that included violent behavior actually increased    m the
1950s to the 1990s, according to survey research. n49 Yet, according to the Surgeon General's report, "the    is very
little risk of violence or harm to a stranger from casual contact with an individual who has a mental disorde    n50

## B. Changing Concepts of Reputation

Plaintiffs in defamation actions seek to protect their reputation. Reputation is rooted in people's social perc∙    ons of
each other, according to legal scholar Robert C. Post, who in 1986 published a frequently cited article on th    pic.
n51 Defamation law makes assumptions about people's relationships with each other in society, and as the    age of
society varies, so does the nature of the reputation that the law seeks to protect. n52 Post identified three    cepts
of reputation that have had the most influence on the development of the common law of defamation, each    which
corresponds [*161] to a different image of society. n53 They are reputation as property, reputation as ho    and
reputation as dignity. n54

The concept of reputation as property corresponds to a "market" image of society and is probably the most    niliar
to contemporary observers. n55 Reputation can be earned through work or the exercise of talent, and the    ket
determines the value of this property. n56 Reputation is viewed as a private possession, n57 and defamatic    w
ensures that the value of an individual's reputation is not unfairly harmed. n58

Reputation also can be conceived of as honor. n59 This concept prevailed when social roles were well-estab    ed, as
was the case in England before the industrial revolution. n60 Honor stemmed from consensus over the stat    f
social roles, n61 rather than from an individual's work. A king did not need to work to receive the honor of .    iship;
he benefited from the honor that society bestowed on his position as king. n62 From this viewpoint, identity    closely
related to one's social or public role, n63 and defamation law defines and enforces these roles to maintain s    ɔl
order. n64 Thus in early common law, criticism of the king was viewed as injuring not only the monarch but    o his
government and possibly his relationship with his subjects. n65

Construing reputation as dignity links the private and public aspects of the self. n66 In this third perspecti society is viewed as communitarian, n67 with an individual's identity shaped by his or her relationship to the com ity. n68 Defamation law protects the dignity that arises from the respect and self-respect that one earns through f membership in society, n69 and this social dignity is maintained by the rules of civility. n70 Defamation la nust protect both the individual's interest in being included within socially acceptable society as well as society' terest in its own rules of civility. n71 [*162] Contemporary society includes elements of market and communitaria ocieties. n72

## III. THE CASES

Cases were considered chronologically to trace changes over time in claims of defamation by imputation o ental disorder. Over the years, significant change occurred along several dimensions related to the underlying c epts of stigma, reputation and medicalization. This section provides in-depth analysis of cases in terms of the type allegation made, and whether it was medicalized or hyperbolic; the concept of reputation underlying the c; property or dignity; the medium in which the comment occurred; the status of the defendant and any rela privilege; and how the parties assessed whether the plaintiff was mentally disordered.

Cases were divided into four temporal thematic periods that emerged from a review of the cases. The bour ries of these periods were permeable and are meant to facilitate discussion; they do not purport to strictly delinea trends in court opinions. The first period begins in 1863, the year of publication of the earliest court opinion ident l for this study, and ends at the close of the 1940s. What sets these cases apart as a group was that they typic involved allegations made by a peer. n73 This changed in the 1950s, when allegations by authority figures came more prevalent. n74 Opinions from the 1960s were characterized by courts' attempts to distinguish betwee medicalized and rhetorical allegations. n75 From 1970 onward, claims were most likely to arise from a wor ace dispute. n76

### A. "Injured Her in Her Good Name": Peers Impute Insanity

The earliest time period, 1863 to the end of the 1940s, was characterized by a sparseness of cases; twent' io opinions were published in those eighty-four years. Most allegations were medicalized, using the terminolo of the times. n77 Although in most cases reputation was construed as [*163] property, n78 reputation as dignit 79 made a strong showing as well. About half the claims arose from messages published in a newspaper; n80 other half, from written or spoken interpersonal communications. n81 Cases filed during these early years typica involved an allegation made by a peer of the plaintiff, rather than someone with power over the plaintiff. n Accusations of mental disorder were most often generated by the plaintiff's behavior n83 but sometimes re ed from expert opinion. n84

[*164] Medicalized terms for mental disorder from this time period included "insane," n85 "insanity," n86 ental derangement," n87 "lunacy," n88 "delusion" n89 and "monomania." n90 Non-medicalized allegations incluc "blockhead," n91 "without brains" n92 and "crazy." n93 In all but a few instances n94 courts found the alle ions-- even the non-medicalized ones--actionable, indicating that mental disorder was indeed stigmatized during se years.

Reputation was construed as both property n95 and dignity n96 in these opinions. Reputation typically was iarded as property in cases where allegations of mental disorder cost the plaintiffs their jobs or professional reputa 1, such as *Moore v. Francis,* n97 a case filed by a bank teller whose "mental condition was not entirely good," acco g to rumors published in the local newspaper. n98 The offending article also stated that the bank had "a little tr le in its affairs occasioned by the mental derangement of Teller Moore." n99 The court agreed with the plaintiff that ch words were defamatory, noting that:

Mental derangement has usually a much more serious significance than mere physical disease. There can be no doubt that the imputation of insanity against a man employed in a position of trust and confidence, such as that of a bank teller . . . is calculated to *injure and prejudice him in that employment* . . . The directors of a bank would naturally hesitate to employ a person as teller [*165] whose mind had once given away under stress of similar duties . . . . n100

Another example of a plaintiff's livelihood being harmed by an allegation of mental disorder occurred in *Tott v. Sun Printing,* where the plaintiff was "removed from a position as professor" following a published claim he was unsound mind." n101 Similarly, in *Wildee v. McKee,* the plaintiff was accused of "insanity and monomania," ich

suggested he "was not fit to be employed as a teacher," n102 while in *Lackey v. Metropolitan Life Ins. Co.*    e
plaintiff was called a "crazy dog," which threatened to "destroy his business" as an insurance adjuster. n1

Reputation was construed as dignity in more than a third of the cases from this time period, n104 making    airly
common. Dignity was at stake when an allegation harmed the plaintiff's social standing or character, as ill    ated by
*Seip v. Deshler,* which arose from an accusation that the plaintiff was "insane." n105 In charging the jury,    : court
stated:

> Insanity, or the condition of one being of unsound mind, is taken notice of by our laws. Where that
> condition of mind exists the unfortunate party thus afflicted is subject to certain regulations. He or :
> is liable to have the control of his or her property taken out of his or her hands, and he or she is liab
> to be taken charge of and confined in an asylum or elsewhere, and for those reasons, outside of the
> *influence that it may have upon the character of the party and the estimation in which she or he is .    f
> in the community.* n106

An accusation of insanity, according to the court in *Seip,* could damage one's ability to be part of a socially
respectable society. Such a loss of autonomy and agency supports social historian Porter's observation tha    uring
this time period, the mentally ill were treated more like prisoners than like sick people. n107

Reputation as dignity was evident in *Bishop v. New York Times.* n108 After newspaper articles accused her    being
"mentally unbalanced," the plaintiff withdrew from society. Her social secretary said that:

> [*166] Instead of going into a dining-room as she had done we would sort of sneak into the grill o
> sneak into some unpretentious little place and have something to eat. In the hotel she would go in t
> back way so no one would see her. She would take a back seat in the theater where previously she
> gone to a box. She would wear a veil so people could not tell her and would not know who she was.
> n109

Similarly, the plaintiff in *Mattox v. News Syndicate Co.* indicated that her standing in civil society had been    med
following a published claim that she "had once been a patient in a mental institution." n110 The plaintiff te    ed that
"when she walked in the street, she heard comments of acquaintances, and whispers, inquiring whether sh    vas the
girl' who had 'been away.' . . . She ceased going to church or any 'formal gathering'; and . . . felt 'self-con:    us and
embarrassed.'" n111

About half the allegations arose from newspaper pieces n112 and the remainder from written and spoken
interpersonal communication. n113 Because the law of libel had yet to be constitutionalized by the U.S. Su    ne
Court's 1964 decision, *New York Times v. Sullivan,* newspapers were unable to use defenses that are comm    today.
n114 For example, a case arising from a published attack on a candidate for Congress went forward. n115    court
said that "great public injury might result" if untrue allegations were published about candidates for public    :e.
n116 The disputed statement, a quotation that gave "the impression that plaintiff was a stupid, ignorant ar    literate
man," would more than likely be non-actionable today. n117 In future time periods, fewer allegations stem    d from
mass media messages. Allegations of mental disorder moved out of public discourse and into the workplace

In the turn-of-the-century time period, defendants who made interpersonal allegations were usually peers     ne
plaintiff, such as a business rival n118 and an angry parent of a schoolchild. n119 In only three cases from    ; time
period were the defendants people who clearly had power over [*167] the plaintiff. Two of these cases inv    ed
remarks by employers, n120 and another involved a physician's diagnosis of insanity at a judicial commitm
proceeding. n121 In future time periods, allegations increasingly came from people with power over the pla    ff.

When a reason for the accusation of mental disorder could be discerned, it typically was based on the plain    ;
behavior, which sometimes was violent. n122 In *Taylor v. McDaniels,* the plaintiff's employer said his "mind    either
affected or he has a vicious temper." n123 The plaintiff teacher in *Wertz v. Lawrence,* was said to have "act    like
she was crazy." n124 The defendant said she had "very severely punished several of her pupils" n125 and l
threatened the defendant with a "heavy iron poker when he visited the school to protest against the punish     its
inflicted." n126 Occasionally, an authoritative body or individual determined that the plaintiff was mentally
disordered. For example, in one case, a governmental lunacy commission determined that the plaintiff was    ;ane."
n127 Another court stated, "insanity is established by the acts and conduct of the person, as well as by the    nion of

expert witnesses on such subject." n128

In these early years, courts let the majority of claims go forward. A typical case might arise from a letter · ten by a
peer and published in a newspaper, making some sort of non-medicalized allegation that could conceivabl  ad to
the social shunning of the plaintiff. Other cases arose when social authorities labeled someone mentally di  dered.
During the next time period, we will see that cases of the latter type became more prevalent.

## B. "More than Ordinary Credibility": Authority Figures as Accusers

Decisions in cases of defamation by imputation of mental disorder became more frequent in the 1950s in ·  parison
with the previous time [*168] period; ten opinions were published during this decade. n129 The increase
published opinions may be explained in part by the deinstitutionalization movement that began in 1956, w  meant
that more individuals with mental disorders were out in society. n130 Court opinions of the time period re  ed the
apparent shame associated with institutionalization for mental disorder, as well as its growing medicalizati  Mental
disorder was frequently linked with psychiatric treatment.

Medicalized allegations predominated during this time period. n131 In *Berry v. Moench,* n132 a psychiatris  id
diagnosed the plaintiff as having "Manic depressive depression in a psychopathic personality" for which "el  ic
shock treatments were recommended." n133 Most cases also discussed institutionalization of the plaintiff,  i4
sometimes through an involuntary commitment process. n135 As a result, the speaker in half these cases  s an
official with power over the plaintiff, either a physician or a judge, n136 in contrast to the allegations mad·  · peers
in earlier decades.

Reputation was construed as dignity in a majority of cases from this time period. n137 Plaintiffs generally  e
concerned about being ostracized [*169] from society as a result of the humiliating experience of being
institutionalized. For example, the plaintiff in *Dunbar v. Greenlaw* claimed he was "restrained and detained  a state
hospital, to his defamation and personal suffering." n138 Similarly, a prisoner who had been "confined in a  rd for
the insane" said the experience was "stigmatizing." n139

Reputation was construed as property in just one case from this time period, which was filed by a physicia  hose
professional competence was at issue. n140 In that case, *Musacchio v. Maida,* a New York court deemed tl  ollowing
statement libelous per se: "There is something with his head. He is in Minnesota receiving treatment." n14  he
words, the court said, could be interpreted to mean the plaintiff was mentally unbalanced and unfit for his  fession.
n142

Just under half the cases from this time period arose from messages in the mass media. n143 The others a  e from
interpersonal communications, n144 and most of these communications were initiated by someone with pc  · over
the plaintiff. n145 For plaintiffs, this continuing shift from allegations by peers to allegations by authority fi  es has
been inauspicious for two reasons. First, the allegations of authority figures can be particularly powerful. A  e court
in *Berry* pointed out, a doctor's "professional status and his duty to keep the confidence of his patient tend  andow
information he gives with more than ordinary credibility." n146 In other words, an allegation of mental disc  r by a
physician can carry more weight than an allegation [*170] by a layperson, and can be more difficult to re  ·.
Second, physicians and other authorities were able to use a privilege-related defense. n147 Physicians spe·  ig at
commitment hearings had the absolute privilege that is accorded to testimony in a judicial proceeding. n14
Similarly, a physician at a medical center for a federal prison had immunity due to his status as a governm  official
acting within the scope of his duties. n149 In a case not involving a physician, a charity that aided patients  state
hospitals had a privilege to communicate with a hospital administrator regarding a particular patient. n150  only
one instance did a court remand a case for a new trial to determine whether a physician's privilege had bee  bused.
n151 In that case, the physician discussed the mental health of a man he had not seen for seven years. n1  In
sum, the credibility associated with officials' assertions, combined with the increased use of privilege, has ii  ased
the "sting" of some allegations of mental disorder while at the same time making them more difficult to ren  y.

During this time period, mental disorder was established by the plaintiff's conduct in society, n153 a physic  s
diagnosis n154 or a combination of the two. n155 Behavior that was viewed as possibly indicative of menta  sorder
included suicide, n156 frightening women by following them home n157 and attacking a man with a butche  iife.
n158

## C. Courts Distinguish Between Medicalized and Rhetorical Allegations

Courts in the 1960s began to distinguish between actionable allegations of mental disorder based on medic.  ed
terminology n159 and non-actionable [*171] allegations based on rhetorical hyperbole, n160 a clear depa  e from
the approach of the late nineteenth century. Clinical terms such as "persecution complex" n161 "paranoia"  2 and

"obsession" n163 were actionable, an apparent result of the medicalization of mental disorder. In contrast on-actionable hyperbole included "nut," n164 "mishuginer" n165 and "screwball," n166 which a state appeals urt dismissed as mere epithets and name-calling. n167 Eleven opinions were published during this decade, sli ly more than in the 1950s. n168

Reflecting the distinction between medicalized and rhetorical allegations, the context in which a word or ph se was used became significant. One court stated that "idiot" n169 had been used in a context where it represent a charge of carelessness. n170 Similarly, context rendered non-actionable the utterance, "you silly stupid senile bu you are a troublemaker and should be confined to an asylum," n171 said at a social gathering in reference to a sto broker. Because the comment in no way referred to the plaintiff's profession, it was not considered slanderous per n172 This obviously contrasts with the decisions of the previous decade that took allegations of institutionalizati very seriously. In another case, a broadcaster sued a rival who described the plaintiff as driven to "insanity." n: The court held it was not slander per se, because the average listener would interpret the statement to mean t the broadcaster was "unreasonable in his actions and his demands," not mentally ill. n174

The concept of reputation as property dominated during the 1960s, with most cases involving assaults on plaintiff's professional reputation. n175 Indeed, three plaintiffs had lost their jobs. n176 One case was filed [*172] a secretary who was placed on involuntary retirement, due to disability, from her federal job with : Public Health Service. n177 Her employer insisted she undergo a psychiatric examination, after which she was de ed "mentally disturbed and unfit for her job." n178 Another case was filed by an officer in the U.S. Air Force a nst a psychiatrist employed by the military, claiming the doctor had forced him into retirement due to disability ed on mental disorder. n179 Yet another case was filed by a clerical worker who was fired from her job with a hc ig agency due to her "obsession that people did not like her." n180

Only three cases from this time period arose from messages in the mass media, n181 continuing the trend at was started in the 1950s. The majority resulted from interpersonal communication. n182 As in the previous de e, most of the interpersonal communication that gave rise to suits had been initiated by someone with power over plaintiff. Most often, these authority figures were physicians--and they were not the plaintiff's family docto personal psychiatrist. In two cases, they worked for the plaintiff's employer. n183 In another two cases, th worked for the plaintiff's former spouse, who had initiated commitment proceedings against the ex-wife n184 or e> isband. n185 All the authority-figure defendants in these suits used a privilege defense, and all but one were succe al. n186 In addition to physicians, these authority figures included a judge n187 and federal government offic in the role of employer. n188

Federal government officials successfully claimed privilege in all three cases in which they were involved. C ts cited *Barr v. Matteo,* in which [*173] the U.S. Supreme Court held that government officials should be "free to rcise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those dutie n189 In the case discussed above involving a Public Health Service secretary, the court noted that the governme had "the paramount interest of any employer in securing efficient employees." n190 In the case of the Air Force ficer, the court emphasized the government's responsibility to the public-at-large rather than to the individual cit . n191 It also recognized the particular importance of having competent military officers: "The deficient mental or sical condition of one man, particularly if he is a flying officer, could easily endanger the health and safety of oth personnel on the Base." n192 When government was the employer, it clearly had great freedom to discuss fitness of its workers, including issues of their mental competence.

By the end of the 1960s, it had become difficult for a plaintiff to prevail in a claim of defamation through in ation of mental disorder. Mental disorder was established during this time period by a physician's diagnosis, n19: dicial decree n194 or the plaintiff's behavior. n195 Both physicians and judges had a privilege to make these pronouncements. n196 Employers had a qualified privilege to discuss the behavior of workers, n197 and pe were able to make rhetorical allegations. n198 Plaintiffs went forward with their claims only when there was evid e that a privilege had been abused, n199 or when a peer made a medicalized allegation affecting the plaintiff's pro sional reputation. n200

## D. Mental Disorder, Medicalization and the Workplace

Despite the increasing difficulty plaintiffs have faced in mounting successful claims of libel by allegation of r tal disorder, legal activity has increased steadily. Opinions published per decade grew to eighteen in the 1970s !01 peaked at twenty-three in the 1980s, n202 continued strong at [*174] twenty in the 1990s, n203 and hav hown no sign of stopping in the twenty-first century. n204 During the last thirty years of the twentieth century, th area of law became somewhat more settled. Cases more frequently arose from medicalized allegations made in wo ace disputes. n205 As a result, [*175] the allegation usually arose from interpersonal communication rather th a mass media message. n206 In addition, because they arose from workplace disputes, claims often were gr ded on

the notion of reputation as property. n207 Fewer defendants were physicians, n208 but many defendants   ·e other
people with power over the plaintiff, such as employers. n209 As in previous years, courts generally held :
rhetorical or hyperbolic allegations were not actionable, n210 although a federal appeals court began to se   nits on
hyperbolic description in *Weyrich.* n211

[\*176]  Workers apparently were concerned about allegations of mental disorder--whether medicalized o   ·third of
hyperbolic--that affected their trade or professional reputations. This concern was not unfounded. Nearly ·
the plaintiffs from this time period were out of a job following the dispute that gave rise to the lawsuit. n2
However, not all the plaintiffs were terminated by their employer. Some resigned, n213 while others were   ced on
medical leaves of absence under threat of termination. n214 Plaintiffs' lines of work in the termination cas   an the
gamut, from a nightclub dancer n215 and a machinist n216 to a chief operating officer n217 and a physici   n218
Although a few of the terminated workers' cases involved hyperbolic  [\*177]  labels such as "nut" n219 ar   crazy"
n220 and did not go forward, most involved an allegation of serious mental disorder, n221 a diagnosis by   nysician
n222 or inappropriate behavior in the workplace. n223 As we will see, the situations in these cases were n   n
different from those at the turn of the twentieth century, when a person's social standing may have slippe   llowing
a disparaging remark about his or her mental stability. The stakes were high in the late twentieth- and ear   wenty-
first century cases. Plaintiffs sought to maintain their livelihoods, and employers grappled with ways to dis   tinue
workers whose behavior was, in many cases, incongruent with the workplace.

Unpredictable, and on occasion frightening, behavior in the workplace sometimes led to allegations of men
disorder. One plaintiff told her co-workers she planned to "come into work one morning and open fire on tl   ither
employees." n224 Another was described by a coworker as "subject to fits of temper . . . she was persona   ifraid to
be alone in his presence." n225 Yet another plaintiff was "distraught and crying" when observed by his suf   isor.
n226 One was said to live with 200 cats. n227 A plaintiff who was an airline pilot allegedly "wrote some ve   idd
letters to the FBI." n228 When faced with unusual behavior, employers sometimes made psychiatric exam   ion of
the worker a condition of his or her continued employment. n229 In each case, the plaintiff refused to com   . n230

In other instances, plaintiffs volunteered that they were experiencing or had been treated for mental disor   For
example, one woman stated in a job interview that she had been hospitalized for depression. n231 Anothe   \*178]
plaintiff went on "'stress leave' for nearly six months on full salary. . . . She claimed that she suffered anxi   attacks
whenever she considered returning to work." n232 In a couple of cases, the plaintiffs had made suicide thr   s. n233

Defendant employers have tended to prevail over plaintiffs during this time period, most often due to quali
privilege. n234 The Second Circuit of the U.S. Court of Appeals held in 2003 that a principal who took seric   / a
guidance counselor's comment about committing suicide had a qualified privilege to tell the counselor's col   jues
that she had "undergone a mental breakdown and was being reassigned for health reasons." n235 Occasio   y the
employer prevailed with another defense, such as truth. n236 For example, the plaintiff who planned to "op   fire"
on her co-workers "failed to offer any evidence that she . . . is not mentally ill," the court stated. n237 In a   tion to
employers, other defendants during this time period who had power over the plaintiff included four physicia   n238
and a prison official. n239 All five cases, which stemmed from interpersonal communication, involved invol   ary
hospitalizations, and four defendants successfully used a privilege defense. n240

The few cases in which plaintiffs were allowed to go forward with their claims against defendant employers   olved
emotionally charged situations and vitriolic comments. Such was the case in *Stratman v. Brent,* a 1997 opi   i in
which the plaintiff police officer sued his former chief over information the chief supplied in job references.   ·1
According to the  [\*179]  complaint, the chief told Stratman's prospective employers the officer was nickna   d
"Code Red," which was departmental slang for a mentally disturbed person; that Stratman was unstable; a   :hat
the chief would not hire him back. n242 Following such comments, Stratman was not offered employment ·   NO
other law enforcement agencies. n243 An Illinois appeals court agreed with the plaintiff that the chief's con   :nts to
prospective employers was not privileged because he had no duty to provide these employers with statem   s about
a former employee. n244 The court also rejected the chief's argument that his comments could be innocent
construed. "It is clear that the defendant intended to describe the plaintiff as someone who was and would   unable
to perform as a law enforcement officer," the court stated. n245 Cases that went forward that did not invol
authority figures generally arose from vengeful personal disputes. These included an ex-husband, n246 the   sband
of a man's paramour n247 and feuding neighbors. n248

Mass media outlets represented less than one-fourth of the defendants in claims of defamation by imputatio   if
mental disorder. Most of the time, they prevailed over plaintiffs because courts held the disputed statement   be
non-actionable opinion or rhetorical hyperbole. n249 For example, a federal district court held in 2001 that
magazine article describing the self-proclaimed daughter of Marilyn Monroe as "nuts" did not "assert what t   author
believes to be the state of [the plaintiff's] mental health" but rather was used in its popular sense n250 anc   is was
not defamatory. n251 Similarly, an opponent of pornography was unsuccessful when she sued  [\*180]  *Hus*

magazine over an article about her that used the terms "wacko," "vengeful hysteria," "twisted" and "bizar
paranoia." n252 The Ninth Circuit of the U.S. Court of Appeals stated that the article was "an expression of    pinion in
an important public debate." n253 Other reasons that claims against the media failed included the plaintif    status as
a public figure n254 and the determination that the offending article was about a matter of legitimate pub    concern.
n255

Courts allowed just four claims of defamation by imputation of mental disorder to go forward against med    utlets.
n256 One of them, a 1978 South Carolina case in which an executive of a nonprofit organization was calle
"paranoid sonofabitch" by a rival executive, probably would not go forward today, given the latitude court    ive been
giving to the popular use of clinical terms. n257 Two others involved serious false statements of fact. n258    iese
three cases do not raise major First Amendment concerns for responsible media organizations; however, t    fourth,
*Weyrich v. New Republic, Inc.,* decided in 2001 by the District of Columbia Circuit of the U.S. Court of App    s, n259
should give pause to media organizations.

This case arose from a magazine article that described plaintiff Paul Weyrich, a conservative political leade    s
"emotionally volatile and short-tempered" n260 and depicted him as "both a zealoted political extremist ar    in
easily-enraged tyrant of the first order." n261 The plaintiff had two key objections to the article: its staten    t that
he experienced "bouts of pessimism and paranoia," n262 which Weyrich claimed was a diagnosable menta    sorder,
and its several descriptions of his alleged extreme behavior. n263 The federal district court for the District
Columbia dismissed the case, but the appeals court reversed and remanded. The appeals court deemed th
accusation of paranoia non-actionable because it was unverifiable [*181] comment. n264 It took serious
however, the descriptions of Weyrich's behavior, which stated he "frothed at the mouth," became "appled    and
was once so irrationally angry that onlookers were "ready to get him a room right next to Hinckley." n265    e court
stated:

> Political commentary can be brutal, and the brutality of that commentary alone does not render
> protected speech unprotected. But neither does the label "political commentary" insulate the reporti
> of verifiable and arguably defamatory facts. There is no doubt that a reasonable person, reading the
> article's repeated tale of appellant's volatile temper and apparent emotional instability, could very w
> conclude that appellant is an emotionally unstable individual *unfit for his trade or profession.* n266

The holding has the potential to chill the raucous, gloves-off speech found in highly partisan publications. F    ever, it
is important to note that the court was aware of the possible impact of such a decision on freedom of expr    on:

> We are mindful that trial courts are understandably wary of allowing unnecessary discovery where F
> Amendment values may be threatened. . . . The District Court may in its discretion limit discovery tc    e
> threshold issue of falsity, thereby delaying and possibly eliminating the more burdensome discovery
> surrounding evidence of "actual malice." n267

In addition, the court stated: "In remanding this case, we do not in any way suggest the proper outcome o    ie
merits. Appellant must still clear a number of difficult hurdles." n268 For example, as a public figure, Weyri    would
have to show that the comments were published with actual malice. n269

## IV. ANALYSIS

It is apparent from the dozens of opinions reviewed above that allegations of mental disorder continue to b
considered defamatory, and that plaintiffs have documented significant harm resulting from them. However    ther
developments in the law of libel, combined with changes in the circumstances that gave rise to the claims,    e
prevented plaintiffs from [*182] recovering in most cases. Speakers in positions of authority--employers,
physicians, judges--were well-represented in the later years of the study, but their statements frequently w
privileged, making it difficult for plaintiffs to prevail. Ironically, these were the speakers whose words were    st
likely to be deemed credible, according to both the courts and social scientific research. Meanwhile, claims    se
more frequently from workplace disputes, endangering the plaintiff's livelihood. In short, allegations of mer
disorder increasingly posed serious financial threats to plaintiffs, yet their claims seldom went forward due    ne
privilege accorded to many speakers. Some plaintiffs were left unemployed, with a damaged reputation anc    :le
legal recourse.

No court argued that imputations of mental disorder had ceased to be defamatory; they tacitly accepted t     purts
defamatory potential of such claims. This contrasts with cases about allegations of homosexuality, in whic    stigma
have been divided on whether such accusations continue to be defamatory. n270 However, the source of       1 in
associated with mental disorder has shifted. In earlier years, it was viewed as a shameful character flaw;
later years, as a formidable professional liability. n272 The belief that mental disorder damages a person's
professional capability appeared to contribute to the continuing stigma associated with this label.

The competing interests in these cases varied according to whether the claim arose from a workplace situ     n or a
media report. The cases arising from workplace situations pitted the plaintiff's interest in protecting reputa    1 and its
pecuniary value against the employer's interest in hiring competent employees. Employers and courts app     ed to
place great emphasis on the diagnosis or label given to the plaintiff's condition as a justification for deemi    1im or
her an unsatisfactory employee. For example, the diagnosis of a "personality disorder" apparently was a k    reason
that a plaintiff in a 1991 case from West Virginia was not hired for a post office job. n273 Yet there was n    scussion
of the requirements of the job and how the alleged disorder prevented her from fulfilling those requiremer    n274
Similarly, according to a federal district court case from 1978, a doctor's report stated that the plaintiff wa    nfit for
his job because of a psychiatric disorder, yet lacked any discussion of what the job requirements were anc    w this
specific psychiatric disorder would prevent him [*183] from carrying them out. n275 A particularly troub    case
was Higgins v. Gordon Jewelry Corp., filed by a terminated jewelry store clerk and decided by a state appe    court in
1988. n276 Pre-employment tests revealed she had received psychiatric treatment in the past, and the sto    hired
her anyway. n277 She proved to be a "model employee" but was fired because of her past medical proble     n278
The court agreed with the defendant that the defense of qualified privilege should have been submitted to    jury.
n279

Employers could reduce the likelihood of these libel suits by following employment practices that meet the    ndards
set by the Americans with Disabilities Act of 1990 (ADA), which covers both physical and mental disabilitie    280
Although the act was not cited in the cases reviewed for this study, its provisions, which emphasize exami    1 the fit
between a job applicant's qualifications and the requirements of a particular job, provide a framework that    1 help
employers to avoid libel claims related to mental disorder, which can be costly, while allowing them to ider    and
hire suitable candidates. It is beyond the scope of this Article to delve into the details of the case law surrc    ling the
ADA, but a review of its basic requirements will show how employers can avoid libel suits simply by satisfy    them.

The ADA requires employers to document the essential functions of a job and consider whether an applicar    an
perform those functions, with or without reasonable accommodation. n281 The law is based on Congress' f    ing that
"individuals with disabilities . . . have been . . . subjected to a history of purposeful unequal treatment . . .    sed on
characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions r    truly
indicative of the individual ability of such individuals to participate in, and contribute to, society." n282 As    saw in
Higgins, employers sometimes have assumed that an individual was an unsuitable candidate because of a    chiatric
diagnosis or history. Under the ADA, employers need to examine the essential functions of the job and whe    er a
given applicant can perform them. If the behavior of a mentally disordered individual is such that he or she    nnot
perform those functions, that individual is not considered qualified for the job. Also, the ADA also allows en    oyers to
include in their qualification standards the "requirement that an individual shall not pose a direct threat to    health
or safety of other individuals in the workplace." n283 Thus employers need not tolerate workers [*184] s    as the
woman who threatened to "open fire on the other employees." n284

Courts gave employers much leeway in discussing the mental health of their employees or prospective emp    ees--
too much at times. Courts cannot presume to change what society finds defamatory, such as mental disorc    but
they can see that employers' privilege is narrowly construed and not abused.

Cases arising from media reports generally weighed the plaintiff's interest in protecting reputation against t
speaker's First Amendment right to discuss matters of public concern. In the nineteenth century, such First
Amendment freedoms were not well developed, so it is no surprise that the topic was not broached in the e     r
cases. n285 By the middle of the twentieth century, courts still were rejecting the public interest defense cl    s of
newspapers. n286 Barry Goldwater won his 1969 claim against the magazine that published his "psychobio    phy;"
the court was satisfied that the article could be viewed as having been published with actual malice. n287

But, following the U.S. Supreme Court's decision in New York Times v. Sullivan, n288 broad protections dev    ped for
speech about matters of public concern. By the 1970s, courts began to embrace public interest-related defe    es, and
this was reflected in the mental disorder claims. In Fram v. Yellow Cab Co. of Pittsburgh, a cab company ex    itive
sued the head of a rival taxi service who said of Fram on a television news show, "that sounds . . . like the    : of
paranoid thinking you get from a schizophrenic." n289 A federal district court rejected the claim, stating th:    1e
show that gave rise to the case dealt with a matter of public concern. n290 Furthermore, Fram was a publi     ure
and failed to provide evidence of actual malice. n291 Similarly, in Demers v. Meuret, in which an airport ex    tive

was called a "demented old man . . . [who] might chop up our airplanes with an axe" n292 at an airport c    mission
meeting, the court held that the comment might be qualifiedly privileged because it was made at the mee    ) of a
public body. n293 By the 1980s and 1990s, imputations of mental disorder that occurred in media reports    re being
deemed nonactionable [*185] opinion. n294 *Hustler's* description of the plaintiff, an anti-pornography ac    st, using
the phrases wacko, vengeful hysteria, twisted and bizarre paranoia, was protected as an "expression of o    on in an
important public debate." n295 However, the District of Columbia Circuit's decision in *Weyrich* is cause for    ncern. A
chilling effect could result from the remand of this case that arose from an article in a strongly partisan po    al
magazine concerning a public figure. Media organizations might note that verifiable accuracy evidently is (    cal to
avoiding liability in reporting about behavior that can be linked to mental disorder.

## V. CONCLUSION

Individual reputation can be difficult to protect when the adversary is a powerful institution such as the m    or
corporate America. Accusing a person of being mentally disordered continues to be defamatory under som
conditions. Such an imputation is most likely to be actionable if it is a medicalized allegation rather than a    perbolic
comment that can be dismissed as opinion. A federal appeals court's 2001 decision in *Weyrich* began to de    e the
boundaries of non-actionable hyperbole, but cases arising from media messages represent a shrinking por    i of the
claims arising from allegations of mental disorder. Adjudicated cases increasingly have arisen from workpl
situations in which there was clear evidence that someone's career is threatened by the imputation. Plaint
however, are likely to have difficulty clearing their names if the allegation was made by an employer or a p    sician
working for an employer. Courts have held that these speakers have a qualified privilege to comment on a    rker's
mental health as they relate to the person's fitness for a job. But employers and physicians sometimes lab    d
employees as mentally disordered without providing any evidence that they were incapable of performing
requirements of a job. Given the pecuniary harm that can clearly result from an allegation of mental disorc    and
the ensuing difficulty in exonerating oneself from the charge, courts need to be more mindful of the use of    alified
privilege in these cases and keep a closer watch on possible abuse. Following the provisions of the ADA ca    elp
employers to avoid problems in this area. Mental disorders are costly to society, and stigma contributes to
inadequate treatment. The law can address that issue by not allowing careless perpetuation of the stigma    ough
employers' stereotypic assumptions about the capabilities of those with mental disorder.

## FOOTNOTES:

n1 David Grann, *Robespierre of the Right,* THE NEW REPUBLIC, Oct. 27, 1997, at 22. *See* Weyrich v. New    ublic,
Inc., 235 F.3d 617, 625 (D.C. Cir. 2001).

n2 Weyrich v. New Republic, Inc., 235 F.3d 617, 623 (D.C. Cir. 2001).

n3 *Id.* at 628.

n4 *Id.*

n5 1999 DEP'T OF HEALTH AND HUM. SERV., MENTAL HEALTH: A REPORT OF THE SURGEON GENERAL 8 [I    einafter
SURGEON GENERAL'S REPORT].

n6 *See generally* Peters v. Baldwin Union Sch. Dist., 320 F.3d 164 (2003) (regarding a woman who lost he    o after
her employer took seriously a joke that she was considering suicide. The court said a reasonable jury could    ve
concluded that the woman was terminated because her employer perceived her as suicidal and therefore
substantially limited in her ability to care for herself); Stratman v. Brent, 683 N.E.2d 951 (Ill. App. Ct. 199
(concerning a police officer who was turned down for two law enforcement jobs after his former supervisor    d
prospective employers that the officer was mentally unstable); Rand v. Miller, 408 S.E.2d 655 (W. Va. 199
(concerning withdrawal of a job offer to a woman whom a company physician diagnosed as having a persor    :y
disorder).

n7 *See, e.g.,* THE AMERICAN PSYCHIATRIC PRESS TEXTBOOK OF PSYCHOPHARMACOLOGY at xix (Alan F. S    atzberg
& Charles B. Nemeroff eds., 1995) (discussing the recent development of the field of psychopharmacology    the
proliferation of information on the topic).

n8 References to mental health abound in popular culture, and the following examples merely scratch the s    ice of
what is available. Books include PETER D. KRAMER, LISTENING TO PROZAC (1997); MARGARET MOORMAN    (
SISTER'S KEEPER: LEARNING TO COPE WITH A SIBLING'S MENTAL ILLNESS (2002); and ELEANOR L. FUTS    ER,
THROUGH THE DARKNESS: COPING WITH THE LEGACY OF MENTAL ILLNESS (2000). Popular music about t

antidepressant Prozac alone is substantial, including BELLEVUE CADILLAC, PROZAC (Hepcat Records, 199    Various
artists, THROW OUT THE PROZAC: HERE COME OUR POLKA HEROES (Our Heritage, 1998); and FRONT LI
ASSEMBLY, COMATOSE: PROZAC 75 MG (Metropolis Records 1998). *See, e.g.,* Joshua Kendall, *Managed*    *Tried*
*to Kill Off Freud: Can Tony Soprano Help Revive Him?* BOSTON GLOBE, Feb. 9, 2003, at D1 (referring to    levision
character on the primetime HBO series *The Sopranos,* who sees a psychiatrist).

n9 SURGEON GENERAL'S REPORT, *supra* note 5, at 4 (citing THE GLOBAL BURDEN OF DISEASE: A COMPI    ENSIVE
ASSESSMENT OF MORTALITY AND DISABILITY FROM DISEASES, INJURIES AND RISK FACTORS IN 1990
PROJECTED TO 2020 (C.J.L. Murray & A.D. Lopez eds., Harvard University, 1996) (explaining that disease    rden
signifies years of life lost to premature death and years lived with a disability of a particular severity and    ition).

n10 SURGEON GENERAL'S REPORT, *supra* note 5, at 8.

n11 *Id.* at 3.

n12 Deborah Perlick, *Special Section on Stigma as a Barrier to Recovery: Introduction,* 52 PSYCHIATRIC    VICES
1613 (2001).

n13 *See* Sara Corbett, *The Permanent Scars of Iraq,* N.Y. TIMES MAGAZINE, Feb. 15 2004, at 66; *see als*    illiam M.
Bulkeley, *Mental Ills Rise Among Soldiers Back From Iraq,* WALL ST. J., July 1, 2004, at B1.

n14 National Institutes of Health, *Reducing Mental Illness Stigma and Discrimination,* NIH Guide (June 18,    04), *at*
http://grants1.nih.gov/grants/guide/pa-files/PAR-04-112.html (last visited Mar. 19, 2005).

n15 *See generally* Talcott Parsons, *The Law and Social Control, in* THE SOCIOLOGY OF LAW: A SOCIAL ST    CTURAL
PERSPECTIVE, at 60-68 (William M. Evan ed., 1980). For additional discussions of the law, society, and so    norms
see H.L.A. Hart, THE CONCEPT OF LAW (1961); ANTHONY T. KRONMAN, MAX WEBER (1983); and ERIC A.    SNER,
LAW AND SOCIAL NORMS (2000).

n16 Parsons, *supra* note 15.

n17 *Id.*

n18 Nichols v. Item Publ'rs, Inc., 132 N.E.2d 860, 861 (N.Y. 1956), *cited in* Marc A. Franklin *et al.,* MASS    IA
LAW: CASES AND MATERIALS 203 (2000) (providing an accurate contemporary definition).

n19 Franklin, *supra* note 18, at 203.

n20 *Id.*

n21 *Id.*

n22 *Id.*

n23 *Id.* (citing Matherson v. Marchello, 100 A.D.2d 233 (N.Y. 1984)). *See also* Elizabeth M. Koehler, *The V.*    *ble*
*Nature of Defamation: Social Mores and Accusations of Homosexuality,* 76 JOURNALISM & MASS. COMM. C    17
(1999).

n24 WEST'S GENERAL DIGEST, Libel & Slander 6(4) (Eleventh Series, 2004).

n25 This Article reviews all cases listed in *West's Digest* in the category "libel by imputation of mental dera    ment"
from the inception of the digest's coverage in 1653 to the present. More cases for review were identified th    gh a
Lexis-Nexis search of state and federal case law searching for "defamation" and "mental illness" or "mental    l" or
"insanity" or "lunacy." Also, the author scrutinized all identified cases for the mention of additional relevant    ses.

n26 Roy Porter, *Madness and its Institutions, in* MEDICINE AND SOCIETY 278 (Andrew Wear ed., 1995).

n27 *See generally* PETER CONRAD & JOSEPH W. SCHNEIDER, DEVIANCE AND MEDICALIZATION: FROM BA    ESS TO
SICKNESS 38-51 (1980).

n28 SURGEON GENERAL'S REPORT, *supra* note 5, at 6.

n29 IRVING GOFFMAN, STIGMA: NOTES ON THE MANAGEMENT OF SPOILED IDENTITY 3 (1963).

n30 IRWIN KATZ, STIGMA: A SOCIAL PSYCHOLOGICAL ANALYSIS 2 (1981); ROBERT M. PAGE, STIGMA 5    )84);
Bruce G. Link et al., *The Consequences of Stigma for Persons with Mental Illness: Evidence from the Socia    :iences*,
*in* STIGMA AND MENTAL ILLNESS 87 (Paul J. Fink and Allan Tasman eds., 1992).

n31 PATRICIA A. ADLER & PETER ADLER, CONSTRUCTIONS OF DEVIANCE: SOCIAL POWER, CONTEXT AN
INTERACTION 7 (1994).

n32 CONRAD & SCHNEIDER, *supra* note 27, at 6.

n33 *Id.* at 7.

n34 *Id.* at 8.

n35 PAGE, *supra* note 30, at 10-11.

n36 CONRAD & SCHNEIDER, *supra* note 27, at 8.

n37 CONRAD & SCHNEIDER, *supra* note 27, at 41-42.

n38 Porter, *supra* note 26, at 279.

n39 PAGE, *supra* note 30, at 25-26.

n40 CONRAD & SCHNEIDER, *supra* note 27, at 44-45.

n41 SURGEON GENERAL'S REPORT, *supra* note 5, at 6.

n42 CONRAD & SCHNEIDER, *supra* note 27, at 45.

n43 PAGE, *supra* note 30, at 10-11.

n44 Porter, *supra* note 26, at 277.

n45 *Id.* at 278.

n46 *Id.*

n47 *Id.*

n48 SURGEON GENERAL'S REPORT, *supra* note 5, at 7.

n49 *Id.*

n50 *Id.*

n51 Robert C. Post, *The Social Foundations of Defamation Law: Reputation and the Constitution,* 74 CAL. L    :V.
691, 692 (1986).

n52 *Id.* at 692-693.

n53 *Id.*

n54 *Id.*

n55 *Id.*

n56 *Id.* at 693-695.

n57 *Id.* at 702.

n58 *Id.* at 695.

n59 *Id.* at 699.

n60 *Id.*

n61 *Id.* at 702.

n62 *Id.*

n63 *Id.* at 702.

n64 *Id.* at 703.

n65 *Id.* at 702. Criticism of government in pre-industrial England was considered seditious libel, a form of    ninal libel. *Id.* Criminal laws also sometimes were used to prosecute a flagrant civil libel on the assumption that    :h action would help to prevent breach of peace. *Id. See* LEONARD W. LEVY, EMERGENCE OF A FREE PRESS 7-8 (1'    ).

n66 POST, *supra* note 51, at 708.

n67 *Id.* at 716.

n68 *Id.* at 709.

n69 *Id.* at 711.

n70 *Id.*

n71 *Id.* at 713.

n72 *Id.* at 721.

n73 *See infra* notes 82-84 and accompanying text.

n74 *See infra* notes 131-136 and accompanying text.

n75 *See infra* notes 159-160 and accompanying text.

n76 *See infra* note 205 and accompanying text.

n77 *See, e.g.,* Mattox v. News Syndicate Co., 176 F.2d 897, 899 (2d Cir. 1949) (concerning a woman who    1 once been a patient in a mental institution); Coulter v. Barnes, 205 P. 943 (Colo. 1922) (stating that the plainti    as recommitted to an insane asylum); Fisher v. Payne, 113 So. 378, 379 (Fla. 1927); Cavanagh v. Elliott, 27(    . App. 21, 22 (Ill. App. Ct. 1933) (concerning a statement that the plaintiff had a decided complex); Joannes v. B    88 Mass. 236 (Mass. 1863) (imputing insanity); Gressman v. Morning J. Ass'n., 90 N.E. 1131, 1133 (N.Y. 191    Moore v. Francis, 23 N.E. 1127, 1128 (N.Y. 1890) (alleging mental derangement); Brunstein v. Almansi, 71 N.Y.S    802 (N.Y. S. Ct. 1947) (using the term "insane"), *aff'd,* 76 N.Y.S.2d 837 (N.Y. S. Ct. 1948); Wemple v. Delano, N.Y.S.2d 322, 323 (N.Y. Sup. Ct. 1946); Bingham v. Gaynor, 141 A.D. 301, 312 (N.Y. Sup. Ct. 1910) (acc    g plaintiff of having a most dangerous and destructive delusion); Lawson v. Morning J. Ass'n., 32 A.D. 71, 7.    .Y. Sup. Ct. 1898); Seip v. Deshler, 32 A. 1032 (Pa. 1895); Wildee v. McKee, 111 Pa. 335, 338 (Pa. 1886) (al    ng insanity and monomania).

n78 *See, e.g.,* Totten v. Sun Printing & Publ'g Ass'n., 109 F. 289, 290 (S.D.N.Y. 1901); Wertz v. Lawrence    ) P. 813, 814 (Colo. 1919), *aff'd,* 195 P. 647 (Colo. 1921) (stating the plaintiff was affected in her profession a: teacher); *Cavanagh,* 270 Ill. App. at 28 (regarding the claim that the disputed allegation could disparage a    llant with his employer and in his employment); McClintock v. McClure, 188 S.W. 867, 869 (Ky. Ct. App. 1916)    jarding the claim that a statement would injure the plaintiff in his business and his business standing); *Joannes,* 1(    Mass. LEXIS 251, *5 (claiming a statement would deprive plaintiff of . . . all income and emoluments from his pr    sional employments); *Gressman,* 1910 N.Y. LEXIS 1091, *5 (stating the plaintiff was discharged from her positio    *Moore,* 23 N.E. at 1129 (claiming a statement was calculated to injure and prejudice the plaintiff in his employme    Taylor v. McDaniels, 281 P. 967, 967-968 (Okla. 1929) (concerning an employer's refusal to reinstate a discharge employee because his mind was affected); Wood v. Boyle, 35 A. 853 (Pa. 1896) (regarding accusations tha    ould

disqualify the plaintiff from a respected and powerful place in the business world); *Wildee,* 111 Pa. at 338 leging the plaintiff was not fit to be employed as a teacher); Lackey v. Metro. Life Ins. Co., 174 S.W.2d 575, 577 enn. Ct. App. 1943) (alleging the defendant made statements to destroy the plaintiff's business.) In some cases, t underlying concept of reputation was unclear. *See, e.g., Coulter,* 205 P. 943.

n79 *See, e.g., Mattox,* 176 F.2d 897, 899-900 (2d Cir. 1949) (regarding the plaintiff's claim that when sh alked in the street, she heard comments inquiring whether she had been institutionalized); *Fisher,* 113 So. at 379 ting the plaintiff had suffered humiliation); *Joannes,* 1863 Mass. LEXIS 251, *5 (regarding an accusation that wou eprive plaintiff of his personal liberty, and of all personal, legal and social rights); Bishop v. N.Y. Times Co., 135 . 845, 848 (N.Y. 1922) (concerning friends' admonitions that plaintiff not visit until after the notoriety surroundir he allegation of her mental instability had subsided); *Gressman,* 90 N.E. 1131, 1134 (concerning a statemen at was injurious to the plaintiff's character in public opinion); *Bingham,* 141 A.D. at 313 (regarding a charge of sc idrelism that defamed the plaintiff's character); *Wood,* 35 S. 853 (concerning a coarse, brutal, malevolent and pur personal attack upon the plaintiff in his private, individual and personal capacity); *Seip,* 1895 Pa. LEXIS 1410, *5 ( cerning plaintiff's claim that the allegation damaged in her reputation, and has hurt her character and feelings); C rian v. Miller, 73 N.W. 1004, 1007 (Wis. 1898) (observing that in this class of actions the plaintiff's character is a ys in issue.) Note that some cases included two concepts of reputation. *See Joannes,* 88 Mass. at 236.

n80 *See, e.g., Mattox,* 176 F.2d 897; *Coulter,* 205 P. 943; Belknap v. Ball, 47 N.W. 674 (Mich. 1890); *Bis.* , 135 N.E. 845; *Gressman,* 90 N.E. 1131; *Moore,* 23 N.E. 1127; *Wemple,* 65 N.Y.S.2d 322; *Bingham,* 141 A.D. : ; *Lawson,* 32 A.D. 71; *Wood,* 35 A. 853; *Candrian,* 73 N.W. 1004. One case arose from a publication, but th rpe could not be determined from the opinion. *See Totten,* 109 F. 289

n81 *See, e.g., Wertz,* 179 P. 813 (concerning spoken statement); *Fisher,* 113 So. 378 (concerning written ·dical report); Cavanagh, 270 Ill. App. 21 (regarding postcard); *McClintock,* 188 S.W. 867 (letter); *Joannes,* 88 s. at 236 (regarding spoken statement); *Brunstein,* 71 N.Y.S.2d 802, (regarding letter); *Taylor,* 281 P. 967 (reg ling letter); *Seip,* 32 A. 1032 (letter); *Wildee,* 2 A. 108 (concerning spoken and written statements); *Lackey,* 1 S.W.2d 575 (regarding spoken statement).

n82 Many cases involved defendant speakers who had power over the plaintiff. *See Fisher,* 113 So. 378 (r rding physicians); *McClintock,* 188 S.W. 867 (regarding employer); *Taylor,* 281 P. 967 (concerning employer).

n83 *Wertz,* 179 P. at 814 (concerning statement that the plaintiff acted like she was crazy); *McClintock,* 18 ;.W. 867 (stating that the plaintiff had done some things that did not look right); *Gressman,* 90 N.E. 1131 (des ing the plaintiff as having suffered a mental collapse and acting queerly); *Lawson,* 32 A.D. at 75 (stating that insa is established by the acts and conduct of the person); *Taylor,* 281 P. at 968 (alleging that the plaintiff's mind s affected or he had a vicious temper).

n84 *Fisher,* 113 So. 378, 379 (physician's diagnosis); *Lawson,* 32 A.D. at 75 (stating that insanity is estab ed by the acts and conduct of the person, as well as by the opinion of expert witnesses).

n85 *See, e.g., Lawson,* 32 A.D. at 72.

n86 *See, e.g., Joannes,* 88 Mass. at 239.

n87 Moore v. Francis, 23 N.E. 1127 (N.Y. 1890).

n88 *Lawson,* 32 A.D. at 72; Wertz v. Lawrence, 195 P. 647 (Colo. 1921).

n89 Bingham v. Gaynor, 141 A.D. 301, 312 (N.Y. Sup. Ct. 1910).

n90 Wildee v. McKee, 2 A.108, 109 (Pa. 1886).

n91 Candrian v. Miller, 73 N.W. 1004, 1005 (Wis. 1898).

n92 Wood v. Boyle, 35 A. 853 (Pa. 1896).

n93 Wertz v. Lawrence, 179 P. 813, 814 (Colo. 1921), *aff'd,* Wertz v. Lawrence, 195 P. 647 (Colo. 1921).

n94 In some cases, the allegations were not actionable. *See* Coulter v. Barnes, 205 P. 943 (Colo. 1922) (re ding truth as a defense); Fisher v. Payne, 113 So. 378, 380 (Fla. 1927) (concerning absolute privilege for words oken in a judicial proceeding); Joannes v. Burt, 88 Mass. 236, 239 (Mass. 1863) (regarding no averment of special

damages); Taylor v. McDaniels, 281 P. 967, 972 (Okla. 1929) (involving no publication); Lackey v. Metro                e Ins.
Co., 174 S.W.2d 575, 583 (Tenn. Ct. App. 1943) (discussing insufficient pleading because allegation was        ntiff's
own paraphrase).

n95 See supra note 78; see also supra text accompanying notes 55-58.

n96 See supra note 79; see also supra text accompanying notes 66-72.

n97 Moore v. Francis, 23 N.E. 1127 (N.Y. 1890).

n98 Id.

n99 Id.

n100 Id. at 1129 (emphasis added).

n101 109 F. 289, 290 (S.D.N.Y. 1901).

n102 2 A. 108, 109 (Pa. 1886).

n103 174 S.W.2d 575, 577-78 (Tenn. Ct. App. 1943).

n104 See supra note 79; see also supra text accompanying notes 66-72.

n105 32 A. 1032, 1033 (Pa. 1895).

n106 1895 Pa. LEXIS 1410 (Pa.) at *14 (emphasis added).

n107 Porter, supra note 26, at 277-278.

n108 135 N.E. 845 (N.Y. 1922).

n109 Id. at 848.

n110 176 F.2d 897, 899 (2d Cir. 1949)

n111 Id. at 899-900.

n112 See supra note 80.

n113 See supra note 81.

n114 376 U.S. 254 (1964).

n115 Belknap v. Ball, 47 N.W. 674 (Mich. 1890).

n116 Id. at 676.

n117 Id. at 675. See also Wemple v. Delano, 65 N.Y.S.2d 322 (N.Y. Sup. Ct. 1946) (concerning remarks m        : at a
municipal meeting); Bingham v. Gaynor, 141 A.D. 301 (N.Y. App. Div. 1910) (concerning published criticisi        f city
police commissioner); Wood v. Boyle, 35 A. 853 (Pa. 1896) (regarding published criticism of a prominent
businessman engaged in public affairs).

n118 See, e.g., Lackey v. Metro. Life Ins. Co., 174 S.W.2d 575, 577-78 (Tenn. Ct. App. 1943).

n119 See, e.g., Wertz v. Lawrence, 179 P. 813, 814 (Colo. 1919).

n120 McClintock v. McClure, 188 S.W. 867, 869 (Ky. 1916); Taylor v. McDaniels, 281 P. 967, 967-968 (Okl       .929).

n121 Fisher v. Payne, 113 So. 378, 379 (Fla. 1927).

n122 Wertz, 179 P. at 814 (stating the plaintiff acted like she was crazy), aff'd, 195 P. 647 (Colo. 1921); M       ntock,

188 S.W. at 869 (Ky. Ct. App. 1916) (stating that the plaintiff had done some things that did not look exa   / right); Gressman v. Morning J. Ass'n, 90 N.E. 1131, 1132 (N.Y. 1910) (stating the plaintiff acted queerly); Taylo   81 P. at 968 (alleging the plaintiff's mind is either affected or he has a vicious temper).

n123 Taylor v. McDaniels, 281 P. 967, 968 (Okla. 1929).

n124 *Wertz,* 179 P. 813, at 814.

n125 *Id.*

n126 *Id. See also* McClintock, 188 S.W. at 869 (stating the plaintiff had done some things in the last year   it did not look exactly right); Gressman, 90 N.E. 1131 (stating the plaintiff acted queerly).

n127 Coulter v. Barnes, 205 P. at 943. *See also* Fisher v. Payne, 113 So. 378, 379 (Fla. 1927) (concernin adjudication of insanity).

n128 Lawson v. Morning J. Ass'n, 32 A.D. 71, 75 (N.Y. Sup. Ct. 1898). *See also* Lackey v. Metro. Life Ins.   ., 174 S.W.2d 575, 580 (Tenn. Ct. App. 1943) ("Insanity can ordinarily be shown only by behavior, words and a(   )f the person in question.").

n129 Tylor v. Glotfelty, 201 F.2d 51 (6th Cir. 1952); MacRae v. Afro-Am. Co., 172 F. Supp. 184 (E.D. Pa.   i9); Campbell v. Jewish Comm. Pers. Serv., 271 P.2d 185 (Cal. Dist. Ct. App. 1954); Cowper v. Vannier, 156 [   2d 761 (Ill. App. Ct. 1959); Dunbar v. Greenlaw, 128 A.2d 218 (Me. 1956); Kenney v. Hatfield, 88 N.W.2d 535 (N   I.; 1958); Musacchio v. Maida, 137 N.Y.S.2d 131 (N.Y. Sup. Ct. 1954); Schumann v. Loew's, Inc., 102 N.Y.S   572 (N.Y. Sup. Ct. 1951); Jarman v. Offutt, 80 S.E.2d 248 (N.C. 1954); Berry v. Moench, 331 P.2d 814 (Utah   i8).

n130 SURGEON GENERAL'S REPORT, *supra* note 5, at 8.

n131 *Tylor,* 201 F.2d at 51 (6th Cir. 1952) (concerning paresis, which is insanity caused by the damage of   philis); *Campbell,* 271 P.2d 185, 187 (Cal. Dist. Ct. App. 1954) (concerning a state mental hospital patient); *Cow*   156 N.E.2d at 762 (Ill. App. Ct. 1959) (referring to the plaintiff as recovering from a mental illness); *Dunbar,* 1   A.2d 218, 219 (Me. 1956) (stating that the plaintiff was insane and had been detained in a state hospital); *Ken*   , 88 N.W.2d 535, 537 (Mich. 1958) (stating that the plaintiff required institutional treatment for mental illness)   *Musacchio,* 137 N.Y.S.2d 131, 132 (N.Y. Sup. Ct. 1954) ("There is something with his head. He is . . . rece   ig treatment."); *Schumann,* 102 N.Y.S.2d 572, 573 (N.Y. Sup. Ct. 1951) (regarding an allegation of mental c   ase); *Jarman,* 80 S.E.2d 248, 252 (N.C. 1954) (regarding a mentally disordered person who was committed to   tate hospital); *Berry,* 331 P.2d 814, 816 (Utah 1958); *See also MacRae,* 172 F.Supp 184 (E.D. Pa. 1959) (conc   ing the untimely death of a nineteen-year-old woman; it had not been determined whether the death was suicide accidental).

n132 331 P.2d at 816 (Utah 1958).

n133 *Id.*

n134 *Tylor,* 201 F.2d 51 (6th Cir. 1952) (discussing confinement in a ward for the insane); *Campbell,* 271 F   185, 187 (Cal. Dist. Ct. App. 1954) (referring to a state mental hospital); *Dunbar,* 128 A.2d 218, 219 (concerni detention in a state hospital); *Kenney,* 88 N.W.2d 535, 537 (Mich. 1958); *Musacchio,* 137 N.Y.S.2d 131, 1   (N.Y. Sup. Ct. 1954); *Jarman,* 80 S.E.2d 248, 252 (N.C. 1954) (regarding the commitment of a mentally disorde   i person to a State hospital).

n135 *Tylor,* 201 F.2d 51 (6th Cir. 1952) (concerning a psychiatrist's confinement of the plaintiff in a federa   edical center); *Dunbar,* 128 A.2d 218 (Me. 1956) (regarding a physician's detention of the plaintiff in a state hos   l); *Kenney,* 88 N.W.2d 535 (Mich. 1958) (involving probate judge's commitment of the plaintiff to a state mer hospital); *Jarman,* 80 S.E.2d 248 (N.C. 1954) (concerning a physician's commitment of the plaintiff to a hc   tal for the mentally disordered).

n136 *Tylor,* 201 F.2d 51 (6th Cir. 1952) (psychiatrist); *Dunbar,* 128 A.2d 218 (Me. 1956) (physician); *Ken*   , 88 N.W.2d 535 (Mich. 1958) (probate judge); *Jarman,* 80 S.E.2d 248 (N.C. 1954) (physician); *Berry,* 331 P.2   14 (Utah 1958) (psychiatrist).

n137 *Tylor,* 201 F.2d 51. (6th Cir. 1952) (describing the effect of a psychiatrist's diagnosis as stigmatizing)   *'acRae,* 172 F. Supp. 184, 187 (E.D. Pa. 1959) (stating that an allegation could lower the plaintiff in the estimation   the

community); *Cowper,* 156 N.E.2d 761, 763 (Ill. App. Ct. 1959) (stating that a person accused of mental ｛ be denied the confidence and respect which all right thinking men normally accord their fellow members ｛ *Dunbar,* 128 A.2d 218, 222 (Me. 1956) (describing the plaintiff's experience of being restrained and detai state hospital, to his defamation and personal suffering); *Schumann,* 102 N.Y.S.2d 572, 573 (N.Y. Sup. C (stating that an allegation could give the impression to many that there was a family weakness which ma transmitted to these plaintiffs, and this possible impression has damaged the plaintiffs); *Berry,* 331 P.2d ｉ 1958) (quoting a letter that stated, "our diagnosis was manic depressive. . . . he will marry someone else life hell for that person.").

n138 *Dunbar,* 128 A.2d 218, 222 (Me. 1956).

n139 *Tylor,* 201 F.2d 51 (6th Cir. 1952).

n140 Musacchio v. Maida, 137 N.Y.S.2d 131 (N.Y. Sup. Ct. 1954). The prevailing concept of reputation co discerned in three opinions from this time period: Campbell v. Jewish Comm. for Pers. Serv., 271 P.2d 18 Ct. App. 1954); *Kenney,* 88 N.W.2d 535 (Mich. 1958); *Jarman,* 80 S.E.2d 248 (N.C. 1954).

n141 *Musacchio,* 137 N.Y.S.2d 131, 132-133 (N.Y. Sup. Ct. 1954).

n142 *Id.*

n143 MacRae v. Afro-Am. Co., 172 F. Supp. 184 (E.D. Pa. 1959) (concerning a newspaper article); Cowpe Vannier, 156 N.E.2d 761 (Ill App. Ct. 1959) (arising from a newspaper article); *Kenney,* 88 N.W.2d 535 (I (concerning a political advertisement in a newspaper); Schumann v. Loew's, Inc. 102 N.Y.S.2d 572 (N.Y. 1951) (regarding a movie).

n144 Tylor v. Glotfelty, 201 F.2d 51 (6th Cir. 1952); *Campbell,* 271 P.2d 185 (Cal. Dist. Ct. App. 1954); C Greenlaw, 128 A.2d 218 (Me. 1956); *Musacchio,* 137 N.Y.S.2d 131 (N.Y. Sup. Ct. 1954); *Jarman,* 80 S.E.. (N.C. 1954); Berry v. Moench, 331 P.2d 814 (Utah 1958).

n145 *Tylor,* 201 F.2d 51 (6th Cir. 1952) (psychiatrist at prison medical center); *Campbell,* 271 P.2d 185 (ı Ct. App. 1954) (charity that assisted patients at state hospitals); *Dunbar,* 128 A.2d 218 (Me. 1956); *Musa* N.Y.S.2d 131 (N.Y. Sup. Ct. 1954) (nature of the speaker was unclear); *Jarman,* 80 S.E.2d 248 (N.C. 195· 331 P.2d 814 (Utah 1958).

n146 *Berry,* 331 P.2d 814, 819 (Utah 1958).

n147 *Tylor,* 201 F.2d 51 (holding that government physician has immunity); *Campbell,* 271 P.2d 185 (holc superintendent of mental institution has privilege); *Dunbar,* 128 A.2d 218 (holding that a physician has ab privilege in judicial lunacy proceeding); *Jarman,* 80 S.E.2d at 252 (noting same); *Berry,* 331 P.2d at 820 ( case to determine if physician abused his conditional privilege).

n148 *See Dunbar,* 128 A.2d 218 (holding that physician has absolute privilege in judicial lunacy proceedin; *Jarman,* 80 S.E.2d at 252 (noting same).

n149 *Tylor,* 201 F.2d at 51.

n150 *Campbell,* 271 P.2d at 188.

n151 *Berry,* 331 P.2d at 820.

n152 *Id.* at 819-20.

n153 MacRae v. Afro-Am. Co., 172 F. Supp. 184 (E.D. Pa. 1959); Kenney v. Hatfield, 88 N.W.2d 535 (Mich )58); *Jarman,* 80 S.E.2d 248.

n154 *Tylor,* 201 F.2d 51; Dunbar v. Greenlaw, 128 A.2d 221 (Me. 1956).

n155 *Jarman,* 80 S.E.2d at 249-250; *Berry,* 331 P.2d 819.

n156 *MacRae,* 172 F. Supp. at 184.

n157 *Kenney,* 88 N.W.2d at 538.

n158 *Jarman,* 80 S.E.2d at 250.

n159 Goldwater v. Ginzburg, 414 F.2d 324, 329 (2d Cir. 1969); Chafin v. Pratt, 358 F.2d 349, 351 (5th C  1966) ("mentally disturbed"); Le Burkien v. Notti, 365 F.2d 143, 144 (7th Cir. 1966; Gilpin v. Tack, 256 F. Supp  52, 564 (W.D. Ark. 1966) ("paranoid schizophrenia"); Gamage v. Peal, 217 F. Supp. 384, 386 (N.D. Cal. 1962); M  nley v. Simmons, 148 So. 2d 648, 649 (Ala. 1963); Chudy v. Chudy, 420 S.W.2d 401, 402 (Ark. 1967).

n160 Correia v. Santos, 191 Cal. App. 2d 844, 853 (Cal. Ct. App. 1961) (stating that a broadcaster's use  he term "insanity" was not to describe the plaintiff as a person who was mentally ill but as one who was unreasona  in his actions and demands); Skolnick v. Nudelman, 237 N.E.2d 810 (Ill. App. Ct. 1968) (concerning the use of  words "nut" and "mishuginer"); Cowan v. Time, Inc., 245 N.Y.S.2d 723, 725 (N.Y. Sup. Ct. 1963) (regarding the  adline, "Idiots Afloat"); Gunsberg v. Roseland Corp., 225 N.Y.S.2d 1021 (N.Y. Sup. Ct. 1962) (regarding the state  nt, "You silly stupid senile bum; you are a trouble maker and should be confined to an asylum").

n161 *Chafin,* 358 F.2d at 355 n.17.

n162 *Goldwater,* 414 F.2d at 331.

n163 *Le Burkien,* 365 F.2d 143, 144.

n164 *Skolnick,* 237 N.E.2d 804 at 810.

n165 *Id.* Mishuginer, also spelled meshuggener, is a Yiddish term for a foolish or crazy person.

n166 *Id.*

n167 *Id.*

n168 *See supra* note 129.

n169 Cowan v. Time, Inc., 245 N.Y.S.2d 723, 725 (N.Y. Sup. Ct. 1963).

n170 *Id.* at 726.

n171 Gunsberg v. Roseland Corp., 225 N.Y.S.2d 1020, 1021 (N.Y. Sup. Ct. 1962).

n172 *Id.*

n173 Correia v. Santos, 191 Cal. App. 2d 844, 848 (Cal. Ct. App. 1961).

n174 *Id.* at 853.

n175 Goldwater v. Ginzburg, 414 F.2d 324 (2d Cir. 1969); Chafin v. Pratt, 358 F.2d 349 (5th Cir. 1966); L  urkien v. Notti, 365 F.2d 143 (7th Cir. 1966); Gamage v. Peal, 217 F. Supp. 384 (N.D. Cal. 1962); McKinley v. Sii  ons, 148 So. 2d 648 (Ala. 1963); Correia v. Santos, 191 Cal. App. 2d 844 (Cal. Ct. App. 1961); Skolnick v. Nud  an, 273 N.E.2d 804 (Ill. App. Ct. 1968); *Gunsberg,* 225 N.Y.S.2d 1020.

n176 *Chafin,* 358 F.2d 349 (involuntary retirement); *Le Burkien,* 365 F.2d 143; *Gamage,* 217 F. Supp. 384  tired on medical disability).

n177 *Chafin,* 358 F.2d at 351.

n178 *Id.*

n179 *Gamage,* 217 F. Supp. at 386.

n180 *Le Burkien,* 365 F.2d at 144.

n181 Goldwater v. Ginzburg, 414 F.2d 324 (2d Cir. 1969) (magazine); Correia v. Santos, 191 Cal. App. 2d  l (Cal. Ct. App. 1961) (radio broadcast); Cowan v. Time, Inc., 245 N.Y.S.2d 723 (N.Y. Sup. Ct. 1963).

n182 *Chafin,* 358 F.2d at 349 (physician's statement); *Le Burkien,* 365 F.2d at 144 (memorandum); Gilpi Tack, 256 F. Supp. 562, 564 (W.D. Ark. 1966) (physician's statement); Gamage, 217 F. Supp. at 386 (physicia statement); McKinley v. Simmons, 148 So. 2d 648, 649 (Ala. 1963) (judge's statement); Chudy v. Chudy ?0 S.W.2d 401, 401 (Ark. 1967) (physician's statement); Skolnick v. Nudelman, 273 N.E.2d 804, 804 (Ill. A⌐  Ct. 1968) (lawyer's statement); Gunsberg v. Roseland Corp., 225 N.Y.S.2d 1020 (N.Y. Sup. Ct. 1962) (emplc ⌐'s statement).

n183 *Chafin,* 358 F.2d at 351; *Gamage,* 217 F. Supp. at 386.

n184 *Chudy,* 420 S.W.2d at 464.

n185 *Gilpin,* 256 F. Supp. at 564.

n186 *Chudy,* 420 S.W.2d at 402 (the court allowed the case to go forward for a determination of whether physician--the ex-husband's brother--had been malicious).

n187 *McKinley,* 148 So. 2d at 649.

n188 *Chafin,* 358 F.2d at 353 (Public Health Service); Le Burkien v. Notti, 365 F.2d 143, 144 (7th Cir. 196 (housing authority); *Gamage,* 217 F. Supp. at 385 (U.S. Air Force).

n189 Barr v. Matteo, 360 U.S. 564, 571 (1959).

n190 *Chafin,* 358 F.2d at 357.

n191 *Gamage,* 217 F. Supp. at 388.

n192 *Id.* at 387. *See also Le Burkien,* 365 F.2d at 145 (stating that the defendant's statements were privil d) (citing Barr v. Matteo, 360 U.S. 564 (1959)).

n193 *Chafin,* 358 F.2d at 351; Gilpin v. Tack, 256 F. Supp. 562, 564 (W.D. Ark. 1966); *Gamage,* 217 F. S⌐ . at 386; Chudy v. Chudy, 420 S.W.2d 401, 462 (Ark. 1967).

n194 McKinley v. Simmons, 148 So. 2d 648, 649 (Ala. 1963).

n195 Goldwater v. Ginzburg, 414 F.2d 324, 331 (2d Cir. 1969) ("He couldn't sleep nights. He was very ner    is.")

n196 *See, e.g.,* McKinley v. Simmons, 148 So. 2d 648 (Ala. 1963) (regarding a judge); Chudy v. Chudy, 4   S.W.2d 401 (Ark. 1967) (regarding a medical doctor.)

n197 *See, e.g.,* Chafin v. Pratt, 358 F.2d 349 (5th Cir. 1966).

n198 *See, e.g.,* Skolnick v. Nudelman, 237 N.E.2d 804 (Ill. App. Ct. 1968).

n199 *Chudy,* 420 S.W.2d 401.

n200 *Goldwater,* 414 F.2d at 331.

n201 Wetzel v. Gulf Oil Corp., 455 F.2d 857 (9th Cir. 1972); Mills v. Kingsport Times-News, 475 F. Supp. 1   5 (W.D. Va. 1979); Hoover v. Peerless Publications Inc., 461 F. Supp. 1206 (E.D. Pa. 1978); Hoesl v. Kasuboski, 4! . Supp. 1170 (N.D. Cal. 1978); Morvay v. Maghielse Tool & Die Co., 1975 U.S. Dist. LEXIS 14411; Fram v. Yellow ( Co., 380 F. Supp. 1314 (W.D. Pa. 1974); O'Barr v. Feist, 296 So. 2d 152 (Ala. 1974); Modla v. Parker, 495 P.2⌐ )4 (Ariz. Ct. App. 1972); Yorty v. Chandler, 91 Cal. Rptr. 709 (Cal. Ct. App. 1970); Gordon v. Shepard, 267 S :d 874 (Fla. Dist. Ct. App. 1972); Russell v. Am. Guild of Variety Artists, 497 P.2d 40 (Haw. 1972); McGowen v. Pr ice, 341 So. 2d 55 (La. Ct. App. 1976); Scott v. Sylvester, 318 So. 2d 65 (La. Ct. App. 1975); Brill v. Brenner, ; N.Y.S.2d 218 (N.Y. Civ. Ct. 1970); Alpar v. Weyerhauser Co., 201 S.E.2d 503 (N.C. Ct. App. 1974); Demer Meuret, 512 P.2d 1348 (Or. 1973); Capps v. Watts, 247 S.E.2d 606 (S.C. 1978); Dickson v. Dickson, 529 l  ! 476 (Wash. Ct. App. 1974).

n202 Leidholdt v. Larry Flynt Publications Inc., 860 F.2d 890 (9th Cir. 1988); Jones v. Am. Broad. Co., Inc.   )4 F. Supp. 1542 (M.D. Fla. 1988); Thomas v. Thomas, 1988 U.S. Dist. LEXIS 10053 (N.D. Ill. 1988); Sisemore   l.S.

News & World Report, Inc., 662 F. Supp. 1529 (D. Alaska 1987); Dee v. Bentley Mgmt. Corp., 1983 U.S.    . LEXIS
16972 (S.D.N.Y. 1983); Blank v. Swan, 487 F. Supp. 452 (N.D. Ill. 1980); Ota v. Health-Chem Corp., 198    Del.
Super. LEXIS 1486 (Del. Super. Ct. 1986); DeMoya v. Walsh, 441 So. 2d 1120 (Fla. Dist. Ct. App. 1983);    stern Air
Lines, Inc. v. Gellert, 438 So. 2d 923 (Fla. Dist. Ct. App. 1983); Lampkin-Asam v. Miami Daily News, 408    2d 666
(Fla. Dist. Ct. App. 1981); Higgins v. Gordon Jewelry Corp., 433 N.W.2d 306 (Iowa Ct. App. 1988); Ferlito    Cecola,
419 So. 2d 102 (La. Ct. App. 1982); Grimes v. Stander, 394 So. 2d 1332 (La. Ct. App. 1981); Bratt v. Int    us.
Mach. Corp., 467 N.E.2d 126 (Mass. 1984); O'Brien v. Lerman, 117 A.D.2d 658 (N.Y. Sup. Ct. 1986); Ker    v. Skulls
Angels, 495 N.Y.S.2d 886 (N.Y. Sup. Ct. 1985); Giaimo v. Literary Guild, 79 A.D.2d 917 (N.Y. Sup. Ct. 19    ; Gaeta
v. N.Y. News, Inc., 465 N.E.2d (N.Y. 1984); Spisak v. McDole, 1984 Ohio App. LEXIS 8769 (Ohio Ct. App.    34);
Kanenson v. Shaffner, 16 Pa. D. & C. 3d 533 (Pa. Ct. Common Pleas 1981); Manley v. Manley, 353 S.E.2c    2 (S.C.
Ct. App. 1987); James v. Brown, 637 S.W.2d 914 (Tex. 1982); Emerson v. Nehls, 287 N.W.2d 808 (Wis.    0).

n203 Grogan v. Sav. of Am., Inc., 118 F. Supp. 2d 741 (S.D. Tex. 1999); Doby v. Decrescenzo, 1996 U.S.    st.
LEXIS 13175 (E.D. Pa. 1996); Minoli v. Evon, 1996 U.S. Dist. LEXIS 20224 (E.D. Pa. 1996); Hunt v. U.S.    Force,
848 F. Supp. 1190 (E.D. Pa. 1994); Kuhn v. Philip Morris U.S.A., Inc., 814 F. Supp. 450 (E.D. Pa. 1993);    npton v.
Conso Prods., Inc., 808 F. Supp. 1227 (D.S.C. 1992); Foretich v. Advance Magazine Publ'rs, Inc., 65 F. Su    1099
(D.D.C. 1991); Martin v. Widener Sch. of Law, 1992 Del. Super. LEXIS 267 (Del. Super. Ct. 1992); Read v    arding,
1994 De. C.P. LEXIS 16 (Del. Ct. Common Pleas 1994); Raskin v. Swann, 454 S.E.2d 809 (Ga. Ct. App. 19    );
Golden v. Mullen, 693 N.E.2d 385 (Ill. App. Ct. 1997); Stratman v. Brent, 683 N.E.2d 951 (Ill. App. Ct. 19    ; Pease
v. Int'l Union of Operating Eng'rs, 567 N.E.2d 614 (Ill. App. Ct. 1991); Tech Plus, Inc. v. Ansel, 1999 Mass    uper
LEXIS 84 (Mass. Super. 1999); Hohlt v. Complete Health Care, Inc., 936 S.W.2d 223 (Mo. Ct. App. 1996)    lish-
Am. Immigration Relief Comm., Inc. v. Relax, 596 N.Y.S.2d 756 (N.Y. App. Div. 1993); Kryeski v. Schott (    is Tech.,
Inc., 626 A.2d 595 (Pa. Super. 1993); Jenkins v. Weis, 868 P.2d 1374 (Utah Ct. App. 1994); Albright v. S    i, 829
P.2d 1114 (Wash. Ct. App. 1992); Rand v. Miller, 408 S.E.2d 655 (W.Va. 1991).

n204 Peters v. Baldwin Union Free School Dist., 320 F.3d 164 (2d Cir. 2003); Weyrich v. The New Republi    nc., 235
F.3d 617 (D.C. Cir. 2001); Smith v. Garber, 2003 U.S. Dist. LEXIS 12155 (E.D. Pa. 2003); Schlieper v. Cit    F
Wichita Falls, 202 U.S. Dist. LEXIS 20443 (N.D. Tex. 2002); Pastorello v. City of N.Y., 2001 U.S. Dist. LEX    9919
(S.D.N.Y. 2001); Maidy v. Guerzon, 2001 U.S. Dist. LEXIS 10559 (D. Md. 2001); Miracle v. New Yorker Ma    tine,
190 F. Supp. 2d 1192 (D. Hawai'I 2001); Brown v. O'Bannon, 84 F. Supp. 2d 1176 (D. Colo. 2000); Dobie    Brefka,
273 A.D.2d 776 (N.Y. App. Div. 2000); State ex rel. Mulholland v. Schweikert, 791 N.E.2d 448 (Ohio 2003    anjuka
v. Metrohealth Med. Ctr., 783 N.E.2d 920 (Ohio Ct. App. 2002); Rizvi v. St. Elizabeth Hosp. Med. Ctr., 765    E.2d
395 (Ohio App. 7 Dist. 2001).

n205 Peters, 320 F.3d 164; Weyrich, 235 F.3d 617; Schlieper, 2002 U.S. Dist. LEXIS 20443; Grogan, 118    Supp.
2d 741; Doby, 1996 U.S. Dist. LEXIS 13175; Minoli, 1996 U.S. Dist. LEXIS 20224; Hunt, 848 F. Supp. 119    Kuhn,
814 F. Supp. 450; Hampton, 808 F. Supp. 1227; Blank, 487 F. Supp. 452; Hoover, 461 F. Supp. 1206; Ho    451 F.
Supp. 1170; Morvay, 1975 U.S. Dist. LEXIS 14411; Ota, 1986 Del. Super. LEXIS 1486; Gellert, 438 So. 2c    3;
Russell, 497 P.2d 40; Stratman v. Brent, 683 N.E.2d 951; Higgins, 433 N.W.2d 306; Bratt 467 N.E.2d 126    nsel,
1999 Mass. Super LEXIS 84; Alpar, 201 S.E.2d 503; Schweikert, 791 N.E.2d 448; Kanjuka, 783 N.E.2d 92    ipisak,
1984 Ohio App. LEXIS 8769; Albright, 829 P.2d 1114; Rand, 408 S.E.2d 655.

n206 But see Weyrich, 235 F.3d 617 (magazine article); Leidholdt, 860 F.2d 890 (magazine article); Garbe    2003
U.S. Dist. LEXIS 12155 (magazine article); Miracle, 190 F. Supp. 2d 1192 (magazine article); Foretich, 76!    Supp.
1099 (magazine article); Jones, 694 F. Supp. 1542 (television broadcast); Sisemore, 662 F. Supp. 1529 (n    azine
article); Dee, 1983 U.S. Dist. LEXIS 16972 (magazine article); Mills, 475 F. Supp. 1005 (newspaper article    ram,
380 F. Supp. 1314 (television broadcast); Martin, 1992 Del. Super. LEXIS 267 (newspaper article); Gellert,    8 So.
2d 923 (newspaper article); Lampkin-Asam, 408 So. 2d 666; Raskin, 454 S.E.2d 809 (newspaper article);    se, 567
N.E.2d 614 (newspaper article); Gaeta, 465 N.E.2d (newspaper article); Polish-Am. Immigration Relief Cor    , 596
N.Y.S.2d 756 (magazine article); Giaimo, 79 A.D.2d 917 (advertisement in brochure); Kanenson, 16 Pa. D    C. 3d
533 (newspaper article); Capps, 247 S.E.2d 606; Jenkins, 868 P.2d 1374 (television broadcast). The remai    er of
the cases listed in notes 201, 202 and 203, supra, arose from some type of interpersonal communication, e    er
written or spoken.

n207 Peters, 320 F.3d 164; Weyrich, 235 F.3d 617; Schlieper, 2002 U.S. Dist. LEXIS; Grogan, 118 F. Supp    d 741;
Minoli, 1996 U.S. Dist. LEXIS 20224; Hampton, 808 F. Supp. 1227; Hunt, 848 F. Supp. 1190; Kuhn, 814 F.    pp.
450; Blank, 487 F. Supp. 452; Hoesl, 451 F. Supp. 1170; Hoover, 461 F. Supp. 1206; Morvay v. Maghielse    ol &
Die Co., 1975 U.S. Dist. LEXIS 14411; Fram, 380 F. Supp. 1314; Yorty, 91 Cal. Rptr. 709; Martin, 1992 De    uper.
LEXIS 267; Ota, 1986 Del. Super. LEXIS 1486; Eastern Air Lines, Inc. v. Gellert, 438 So. 2d 923 (Fla. Dist.    App.
1983); Lampkin-Asam, 408 So. 2d 666; Russell, 497 P.2d 40; Golden, 693 N.E.3d 385; Stratman, 683 N.E    951;
Pease, 567 N.E.2d 614; Higgins, 433 N.W.2d 306; McGowen v. Prentice, 341 So. 2d 55 (La. Ct. App. 1976)    ratt,
467 N.E.2d 126; Ansel, 1999 Mass. Super. LEXIS 84; Dobies, 273 A.D.2d 776; Polish-Am. Immigration Rel.    Comm.,

*Inc.,* 596 N.Y.S.2d 756; *Kersul,* 495 N.Y.S.2d 886; *Schweikert,* 791 N.E.2d 448; *Kanjuka,* 783 N.E.2d 920; *izvi,* 765 N.E.2d 395; *Spisak,* 1984 Ohio App. LEXIS 8769; *Kryeski,* 626 A.2d 595; *Capps,* 247 S.E.2d 606; *Albrigh* 29 P.2d 1114.

n208 *Garber,* 2003 U.S. Dist. LEXIS 12155; Hoesl, 451 F. Supp. 1170; *O'Barr,* 296 So. 2d 152; *Grimes,* 3 So. 2d 1332; *Manley,* 353 S.E.2d 312; *James,* 637 S.W.2d 914; *Rand,* 408 S.E.2d 655.

n209 *Peters,* 320 F.3d 164; *Pastorello,* 2001 U.S. Dist. LEXIS 19919 (hospital personnel involved with inv〈 〉tary commitment); *Maidy,* 2001 U.S. Dist. LEXIS 10559; *Grogan,* 118 F. Supp. 2d 741; *Doby,* 1996 U.S. Dist. IS 13175; *Hampton,* 808 F. Supp. 1227; *Hunt,* 848 F. Supp. 1190 (employer); *Kuhn,* 814 F. Supp. 450; *Blar* 487 F. Supp. 452; *Hoover,* 461 F. Supp. 1206 (employment reference); *Morvay,* 1975 U.S. Dist. LEXIS 14411; *C* 1986 Del. Super. LEXIS 1486; *Gellert,* 438 So. 2d 923; *Russell,* 497 P.2d 40 (former employer acting as referer ; *Stratman,* 683 N.E.2d 951; *Higgins,* 33 N.W.2d 306; *McGowen,* 341 So. 2d 55; *Bratt,* 467 N.E.2d 126; *Al*₁ 201 S.E.2d 503; *Kersul,* 495 N.Y.S.2d 886; *Schweikert,* 791 N.E.2d 448 (law partner); *Kanjuka,* 783 N.E.2d 9; *Albright,* 829 P.2d 1114; *Emerson,* 287 N.W.2d 808 (sheriff at jail where plaintiff was incarcerated).

n210 *Weyrich,* 235 F.3d 617, 625 (stating that an Article's suggestion that appellant's behavior exhibited ' anoia" was rhetorical sophistry;) *Leidholdt,* 860 F.2d at 894 (holding that "wacko" and "bizarre paranoia" are pro ed opinion); Wetzel v. Gulf Oil Corp, 455 F.2d 857, 863 (9th Cir. 1972) (stating that "nut" and "crazy" were r ibelous in context of case); *Garber,* 2003 U.S. Dist. LEXIS 12155 (stating that use of the term "kooks" is hyperbol nd does not constitute defamation); *Miracle,* 190 F. Supp. 2d 1192, 1200 (holding that use of the word "nuts" did ι assert what the author believed to be the state of the plaintiff's mental health and therefore was not defamatory' ᴐnes, 694 F. Supp. at 1552 ("wacky screwball" is non-actionable opinion); *DeMoya,* 441 So. 2d 1120 (holding th raving maniac" and "raving idiot" are pure opinion); *McGowen,* 341 So. 2d at 58 (stating that "nuts" is an unflatt〈 g word rather than actionable defamation); *Ansel,* 1999 Mass. Super. LEXIS 84 (describing the words "crazy" and ᥭatic" are rhetorical hyperbole or pure opinion); *Hohlt,* 936 S.W.2d at 224 (stating that "crazy" is discourteous b ot legally defamatory); *Polish-Am. Immigration Relief Comm., Inc.,* 596 N.Y.S.2d 756 (stating that "madhous s rhetorical hyperbole and vigorous epithet); *Kersul,* 495 N.Y.S.2d at 890 (holding that "crazy" is not slande ᥭr se); *Brill,* 308 N.Y.S.2d 218 (holding that "berserk" is not actionable); *Rizvi,* 765 N.E.2d 395, 400 (stating that ᥭzy" is an expression of opinion that generally does not subject one to liability); *Kryeski,* 626 A.2d 595 (describinᵍ razy" as a vigorous epithet); *Kanenson,* 16 Pa. D. & C. 3d at 535 (stating that "crazy" was not capable of defamato neaning in the context in which it appeared). *But see Minoli,* 1996 U.S. Dist. LEXIS 20224 (holding that a statemen ᥭiming the defendant was crazy and had stolen business and jewelry designs was specific enough to be actionable ᵗead, 1994 Del. C. P. LEXIS 16 (stating that it was too early in court proceedings to determine whether calling tᵗ laintiff "crazy" and "loony" in a loud enough voice that all neighbors could hear was an expression of opinion or a ᵗement that the plaintiff suffered from mental disorder); *Golden,* 693 N.E.2d at 391 (holding that the words "ravin ᥭatic" and "deranged lawyer" in a letter from an attorney to a client and his wife are not absolutely privileged).

n211 235 F.3d 617, 626 (D.C. Cir. 2001) ("An article's political 'context' does not indiscriminately immuniz ᵥery statement contained therein . . . the line separating a fabricated narrative and a hyperbolic description of ᵃ ctual event is sometimes fuzzy.").

n212 *See, e.g., Peters,* 320 F.3d 164, 166 (involving termination of non-tenured guidance counselor); *Sch*〈 ᥭr, 2002 U.S. Dist. LEXIS 20443 (regarding a police chief who was fired); *Grogan,* 118 F. Supp. 2d 741 (regar ᴊ a bank manager who was discharged); *Thomas,* 1988 U.S. Dist. LEXIS 10053 (concerning a son fired from h ιther's business); *Hunt,* 848 F. Supp. 1190 (concerning the discharge of shipyard worker); *Blank,* 487 F. Supp. 45 (regarding the suspension of a welfare caseworker); Hoesl v. United States, 451 F. Supp. 1170 (N.D. Cal. : ᴈ) (regarding an electrical engineer placed on emergency medical suspension); Morvay v. Maghielse Tool & Di o., 1975 U.S. Dist. LEXIS 14411 (W.D. Mich. 1975) (concerning a fired machinist); *Ota,* 1986 Del. Super. LEXI 486 (regarding discontinuation of the employment of president and chief operating officer); *Russell,* 497 P.2d 4 (concerning termination of nightclub performer); *McGowen,* 341 So. 2d 55 (concerning a teacher's lost job] ersul, 495 N.Y.S.2d 886 (concerning termination of an officer manager); *Alpar,* 201 S.E. 2d 503 (regarding dismiᵗ of a nurseryman); *Schweikert,* 791 N.E.2d 448 (regarding law partners who sought dissolution of partnership); ᥑjuka, 783 N.E.2d 920 (regarding a nurse who lost her job, although there was a dispute as to whether she quit o ᵃs fired); *Rizvi,* 765 N.E.2d 395 (rergarding physician whose contract was not renewed); *Spisak,* 1984 Ohio A| LEXIS 8769 (regarding residential facility manager's discharge following refusal of a superior's sexual advances).

n213 Stratman v. Brent, 683 N.E.2d 951 (Ill. App. Ct. 1997) (concerning police officer who resigned before ployer was able to fire him and subsequently received poor reference from the former employer); Albright v. Wasᵗ ton, 829 P.2d 1114 (Wash. Ct. App. 1992) (regarding school counselor who resigned instead of undergoing psyᴄ tric exam demanded by his employer).

n214 Hampton v. Conso Prods., Inc., 808 F. Supp. 1227 (D.S.C. 1992) (involving machine operator told t    ike a
medical leave of absence or be terminated).

n215 *Russell,* 497 P.2d 40.

n216 *Morvay,* 1975 U.S. Dist. LEXIS 14411.

n217 *Ota,* 1986 Del. Super. LEXIS 1486.

n218 *Rizvi,* 765 N.E.2d 395.

n219 *McGowen,* 341 So. 2d 55.

n220 Kersul v. Skulls Angels, Inc., 495 N.Y.S.2d 886 (N.Y. Sup. Ct. 1985); *Rizvi,* 765 N.E.2d 395. *But see*    isak v.
McDole, 1984 Ohio App. LEXIS 8769, at *3 (Ohio Ct. App. 1984) (involving a supervisor who called an em    yee "a .
. . slut, a . . . whore, mentally-ill and a retard"). This opinion upheld a jury award in favor of the plaintiff.

n221 *See, e.g,* Peters v. Baldwin Union Free Sch. Dist., 320 F.3d 164 (2d Cir. 2003).

n222 Hoesl v. United States, 451 F. Supp. 1170 (N.D. Cal. 1978) (concerning psychiatrist employed by th    avy who
issued report stating that plaintiff, also a Navy employee, was unfit for employment due to a psychiatric d    der).

n223 *See, e.g.,* Hampton v. Conso Prods., Inc., 808 F. Supp. 1227, 1231 (D. S.C. 1992) (concerning plair    who
threatened to "open fire" on coworkers); Ohio ex rel. Mulholland v. Schweikert, 791 N.E.2d 448, 449 (Ohi    )03)
(concerning plaintiff who was a danger to himself and others and had engaged in irrational and violent bel    or.)

n224 *Hampton,* 808 F. Supp. 1227, 1231.

n225 Alpar v. Weyerhauser Co., 201 S.E. 2d 503 (N.C. Ct. App. 1974), 1974 N.C. App. LEXIS 2436, at *5.

n226 Bratt v. Int'l. Bus. Mach. Corp., 467 N.E.2d 126 (Mass. 1984).

n227 Tech Plus, Inc., v. Ansel, 1999 Mass. Super. LEXIS 84, at *7 (Mass. Super. Ct. 1999).

n228 Eastern Air Lines, Inc., v. Gellert, 438 So. 2d 923, 926 (Fla. Ct. App. 1983).

n229 Kuhn v. Phillip Morris, Inc., 814 F. Supp. 450 (E.D. Pa. 1993); *Hampton,* 808 F. Supp. 1227; Morvay
Maghielse Tool & Die Co., 1975 U.S. Dist. LEXIS 14411 (W.D. Mich. 1975); Albright v. Washington, 829 P.    L114
(Wash. Ct. App. 1992).

n230 *Id.*

n231 *Kuhn,* 814 F. Supp. 450, 452. *See also* Higgins v. Gordon Jewelry Corp., 433 N.W.2d 306 (Iowa Ct. *    1988)
(concerning plaintiff who revealed she had been treated by a psychiatrist for past emotional problems); Br    /. Int'l.
Bus. Mach. Corp., 467 N.E.2d 126 (Mass. 1984) (involving plaintiff who told supervisor he had bad nerves,
headaches and an inability to sleep).

n232 Grogan v. Savings of Am., Inc., 118 F. Supp. 2d 741, 746 (S.D. Tex. 1999). *See also Albright,* 829 P    1114
(concerning worker who requested low-stress assignment due to hypertension).

n233 Peters v. Baldwin Union Free Sch. Dist., 320 F.3d 164 (2d Cir. 2003); Doby v. DeCrescenzo, 1996 U.!    ist.
LEXIS 13175 (E.D. Pa. 1996).

n234 *Peters,* 320 F.3d 164, 170; Hoesl v. Kasuboski, 451 F. Supp. 1170, 1181 (N.D. Cal. 1978); Ota v. He    -Chem
Corp., 1986 Del. Super. LEXIS 1486, at *18-19 (Del. Super. Ct. 1986); Russell v. Am. Guild of Variety Arti:    497
P.2d 40, 46 (Haw. 1972); *Higgins,* 433 N.W.2d 306; Bratt v. Int'l Bus. Mach. Corp., 467 N.E.2d 126 (Mass.    84);
Alpar v. Weyerhauser Co., 201 S.E.2d 503, 507-508 (N.C. Ct. App. 1974).

n235 *Peters,* 320 F.3d 164, 166.

n236 Hampton v. Conso Products, Inc., 808 F. Supp. 1227 (D. S.C. 1992). *See also Kuhn,* 814 F. Supp. 45    54
("Plaintiff has never hidden the fact that she has suffered from mental illness. . . . Truth is an absolute defe    · to

allegations of defamation.").

n237 *Hampton,* 808 F. Supp. 1227, 1237.

n238 Pastorello v. City of New York, 2001 U.S. Dist. LEXIS 19919 (S.D.N.Y. 2001); O'Barr v. Feist, 296 S  d 152
(Ala. 1974); Manley v. Manley, 353 S.E.2d 312 (S.C. Ct. App. 1987); James v. Brown, 637 S.W.2d 914 (1  1982).

n239 Emerson v. Nehls, 287 N.W.2d 808 (Wis. 1980).

n240 *O'Barr,* 296 So. 2d at 157 (holding that statements made during a judicial proceeding are absolutely
privileged); *Manley,* 353 S.E.2d at 313 (concerning defendant children and physician who had a qualified  ilege to
make statements in good faith about mother after she threatened suicide); *James,* 637 S.W.2d at 917 (he  ig that
physician's statement during a judicial proceeding is absolutely privileged); *Emerson,* 287 N.W.2d at 809  ting
sheriff acted within his statutory authority in transferring inmate to mental hospital).

n241 Stratman v. Brent, 683 N.E.2d 951 (Ill. Ct. App. 1997).

n242 *Id.* at 956.

n243 *Id.* at 954.

n244 *Id.* at 958.

n245 *Id.* at 959. *See also* Doby v. DeCrescenzo, 1996 U.S. Dist. LEXIS 13175, at \*31 (E.D. Pa. 1996) (cor  ning
worker who said she was romantically involved with supervisor sued him after he began involuntary comm  ent
proceedings against her); Blank v. Swan, 487 F. Supp. 452, 455 (N.D. Ill. 1980) (concerning supervisor w
suspended employee and told others she was emotionally disturbed and had tried to blackmail him); Kanju  v.
Metrohealth Med. Ctr., 783 N.E.2d 920 (Ohio Ct. App. 2002) (concerning popular nurse who had conflicts \
manager who had a reputation for being inappropriately abrasive); Spisak v. McDole, 1984 Ohio App. LEXI  769
(Ohio Ct. App. 1984) (regarding woman who was fired after refusing sexual advances of supervisor; super'  r then
told others woman was mentally ill, among other aspersions).

n246 Dickson v. Dickson, 529 P.2d 476 (Wash. Ct. App. 1974).

n247 Scott v. Sylvester, 318 So. 2d 65 (La. Ct. App. 1975).

n248 Read v. Harding, 1994 Del. C.P. LEXIS 16 (Del. Ct. Common Pleas, 1994). *See also* Minoli v. Evon, 1!  U.S.
Dist. LEXIS 20224 (E.D.N.Y. 1996) (former business partner); Golden v. Mullen, 693 N.E.2d 385 (Ill. App.  1997)
(rival attorney); Capps v. Watts, 246 S.E.2d 606 (S.C. 1978) (head of rival nonprofit organization).

n249 Leidholdt v. L.F.P., Inc., 860 F.2d 890 (9th Cir. 1988); Smith v. Garber, 2003 U.S. Dist. LEXIS 12155  D. Pa.
2003); Miracle v. New Yorker Magazine, 190 F. Supp. 2d 1192 (D. Haw. 2001); Jones v. Am. Broad. Co., 6  F.
Supp. 1542 (M.D. Fla. 1988); Yorty v. Chandler, 91 Cal. Rptr. 709 (Cal. Ct. App. 1970); Lampkin-Asam v. i  ni
Daily News, Inc., 408 So. 2d 666 (Fla. Dist. Ct. App. 1981); Polish-Am. Immigration Relief Comm., Inc., v.  ax 596
N.Y.S.2d 756 (N.Y. App. Div. 1993); Kanenson v. Shaffner, 16 Pa. D. & C. 3d 533 (Pa. Ct. Common Pleas 1  .).

n250 *Miracle,* 190 F. Supp. 2d 1192, 1200-1201.

n251 *Id.* at 1201.

n252 *Leidholdt.,* 860 F.2d 890, 894.

n253 *Id.*

n254 Dee v. Bentley Mgt. Corp., 1983 U.S. Dist. LEXIS 16972 (S.D.N.Y. 1983); Martin v. Widener Univ. Sch  ' Law,
1992 Del. Super. LEXIS 267 (Del. Super. Ct. 1992).

n255 Gaeta v. N.Y. News, Inc., 465 N.E.2d 802 (N.Y. 1984). *See also* Foretich v. Advance Magazine Publ'rs,  :., 765
F. Supp. 1099, 1106 (D. D.C. 1991) (far-fetched innuendo); Raskin v. Swann, 454 S.E.2d 809, 811 (Ga. Ct  ip.
1995) (lacks allegation of falsity); Giaimo v. Literary Guild, 434 N.Y.S.2d 419, 420 (N.Y. Sup. Ct. 1981) (fai  ɔ
establish article is "of and concerning" plaintiffs).

n256 Weyrich v. New Republic, Inc., 235 F.3d 617 (D.C. Cir. 2001); Sisemore v. U.S. News & World Repo   562 F.
Supp. 1529 (D. Alaska 1987); Mills v. Kingsport Times-News, 475 F. Supp. 1005 (W.D. Va. 1979); Capps   Watts,
246 S.E.2d 606 (S.C. 1978).

n257 *Capps,* 246 S.E.2d 606.

n258 *Sisemore,* 662 F. Supp. 1529 (involving magazine that accused man of being a veteran with post-tr   iatic
stress disorder, despite evidence it knew he had never been to Vietnam or in combat); *Mills,* 475 F. Supp.   05
(regarding newspaper which falsely reported that a murder suspect had been committed to a state hospiti   ir
psychiatric evaluation).

n259 *Weyrich,* 235 F.3d 617 (D.C. Cir. 2001).

n260 *Id.* at 620.

n261 *Id.*

n262 *Id.* at 621.

n263 *Id.* at 625.

n264 *Id.* at 626.

n265 *Id.* at 621-622. John Hinckley attempted to assassinate President Ronald Reagan in 1982.

n266 *Id.* at 628 (emphasis added).

n267 *Id.*

n268 *Id.*

n269 *Id.*

n270 *See, e.g.,* Hayes v. Smith, 832 P.2d 1022, 1025 (Colo. Ct. App. 1991) ("An accusation of being a hor   exual is
not of such a character as to be slanderous per se."); Matherson v. Marchello, 100 A.D.2d 233, 241 (N.Y. ¢   Ct.
1984) ("It cannot be said that social opprobrium of homosexuality does not remain with us today."). For a   :ussion
on this topic, see Elizabeth M. Koehler, "The Variable Nature of Defamation: Social Mores and Accusations   
Homosexuality," 76 JOURNALISM & MASS COMM. Q. 217 (1999).

n271 *See supra* note 38.

n272 *See supra* note 205 and accompanying text.

n273 Rand v. Miller, 408 S.E.2d 655 (W.Va. 1991).

n274 *Id.*

n275 Hoesl v. Kasuboski, 451 F. Supp. 1170, 1173 (N.D. Cal. 1978).

n276 Higgins v. Gordon Jewelry Corp. 433 N.W.2d 306 (Iowa Ct. App. 1988).

n277 *Id.*

n278 *Id.*

n279 *Id.*

n280 42 U.S.C. § 12101-12213 (2000).

n281 *Id.* at § 12111(8).

n282 *Id.* at § 12101 (emphasis added).

n283 *Id.* at § 12113.

n284 Hampton v. Conso Prods., Inc., 808 F. Supp. 1227, 1231 (D.S.C. 1992).

n285 *But see* Wood v. Boyle, 35 A. 853 (Pa. 1896) (containing a reference to privilege based on the fact t    the plaintiff was a public official-court rejected the argument).

n286 MacRae v. Afro-Am. Co., 172 F. Supp. 184 (E.D. Pa. 1959) (rejecting conditional privilege defense fc comments made about a university president's wife); Wemple v. Delano, 65 N.Y.S.2d 322 (N.Y. Sup. Ct. 1    ɔ) (rejecting the justification that the article reporting on the official proceedings of a municipal board).

n287 Goldwater v. Ginzburg, 414 F.2d 324, 328 (2d Cir. 1969).

n288 *N.Y. Times,* 376 U.S. 254 (1964).

n289 Fram v. Yellow Cab Co., 380 F. Supp. 1314, 1325 (W.D. Pa. 1971).

n290 *Id.* at 1333.

n291 *Id.* at 1338.

n292 Demers v. Meuret, 512 P.2d 1348 (Or. 1973).

n293 *Id.* at 1350.

n294 Leidholdt v. Larry Flynt Publ'ns, 860 F.2d 890 (9th Cir. 1988); Lampkin-Asam v. Miami Daily News, 4    ɔo. 2d 666 (Fla. Dist. Ct. App. 1981).

n295 *Leidholdt,* 860 F.2d 890, 894.

◄ previous  **Document 3 of**    next ►►

Terms & Conditions   Privacy   Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All Rights Re    ⁄ed.